**Jacqueline McKEAMER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 81–396.

District of Columbia Court of Appeals.

Argued June 22, 1982.

Decided Oct. 27, 1982.

Gary Abrams, L.S. # 3178 for appellant. Lois Yankowski, Supervising Atty., Washington, D.C. and Eileen Harrington, law student, were on the briefs for appellant.

E. Anne McKinsey, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty. and John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the briefs were filed, John R. Fisher, and F. Joseph Warin, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and MACK, Associate Judges.

MACK, Associate Judge:

Appellant challenges her conviction of second-degree murder while armed, D.C. Code 1973, §§ 22–2403, –3202, claiming that the trial court erred in refusing to suppress statements elicited from her in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We agree and reverse.[1]

---

1. In light of our disposition on *Miranda* grounds, we need not consider appellant's other bases for appeal—whether the trial court erred in excluding expert testimony with re-

spect to appellant's mental retardation and its effect on her demeanor as a witness and whether sufficient evidence was presented at trial to support her conviction.

In the early evening of February 10, 1980, Officers Sonia Maldonado and Robert Rau responded to a radio run for a stabbing at an apartment building on 13th Street, Northwest. When they arrived at the building at 6:25 p.m. they went first to Apartment 34 where the victim, apparently deceased, was lying on a bed. Members of the ambulance crew who had been attending the deceased (later identified as appellant's boy friend) told the officers that the person responsible for the stabbing was across the hall. As they entered Apartment 32 they saw appellant, another woman and a child. Before the officers said anything, appellant, referring, to the other woman, said "This is my cousin. I stabbed him."

At that point Officer Rau advised appellant of her *Miranda* rights and presented her with a PD 47 card to sign. She answered "no" to the third and fourth questions of the card, thus indicating that she was not willing to answer questions and wished to have a lawyer present. She then refused to sign the card and Officer Maldonado wrote "Refused" on the line provided for the signature of the accused.

Thereafter, neither officer questioned appellant about the stabbing. Appellant repeated several times that she had stabbed the decedent, however, and asked if the victim was dead and what was going to happen to her next. Officer Rau testified at the hearing on the motion to suppress that appellant had been drinking but was not intoxicated and that he noticed no impairment in her speech. Officer Maldonado, who arrested appellant and transported her to the Homicide Bureau, testified that once at the Bureau appellant became increasingly nervous and hesitant about talking and asked repeatedly for cigarettes.[2] She further testified that she knew appellant was to be interrogated about the crime when she arrived at the Homicide Bureau,

that appellant led her to believe that she did not want to answer any questions and that she did not tell the detectives who interviewed appellant at the Homicide Bureau that appellant had indicated she did not want to answer questions.

Detective John Aduddell met appellant in an interview room at the Homicide Bureau at approximately 7:15 p.m. Appellant was handcuffed to a radiator[3] and while Aduddell noticed a trace of alcohol on appellant's breath and that she had been crying, he testified that she was coherent. He read her *Miranda* rights and testified that she indicated that she was willing to talk. He then said to her "Jackie, tell me what happened tonight." He did not ask her whether she had been previously advised of her rights nor did he confer with Officer Maldonado, who was present, about whether appellant had earlier waived those rights.[4]

In response to Detective Aduddell appellant began her statement soon after she entered the interview room. As she spoke, the detective typed out the first two pages of the statement which was ultimately three pages in length. He described his encounter with appellant as "cordial" and "friendly."

After Detective Aduddell finished interviewing appellant at approximately 8:00 p.m., Detective Francis McCloskey, who had investigated the crime scene and spoken to appellant briefly there, began to interview appellant. He testified that he did not give appellant fresh *Miranda* warnings before he began questioning her. He testified that she told him she had gone to school through the seventh grade but could not read too well because she was not wearing glasses. He, therefore, at approximately 8:15 p.m., read her statement to her and noticed that she had not executed a *Miranda* waiver

---

2. Officer Maldonado testified that cigarettes were provided to appellant and that, while appellant grew progressively more nervous as the evening wore on, she was still not as nervous as others she had arrested.

3. The handcuff was later removed from appellant's wrist.

4. Detective Aduddell testified that he did not discover that appellant had earlier declined to answer questions until the day before the suppression hearing.

form. He asked her the questions required under *Miranda* and she wrote "you" in response to the first two questions. When McCloskey pointed out her mistake she changed her responses to "yes" and then answered the other questions affirmatively and signed the waiver as well as each of the three pages of her statement.

Appellant moved to suppress her spontaneous statement at the apartment as well as the statement she made at the Homicide Bureau, claiming they were involuntary and elicited in violation of the strictures of *Miranda.* The trial court refused to suppress either of the statements. It ruled that the statements made at the crime scene were voluntary. It further found, *inter alia,* that appellant was fully apprised of her rights at the scene, that she was readvised at the Homicide Bureau, that she, thus, had an opportunity to again decline to answer questions and that her ultimate agreement to answer was voluntary.

On appeal, appellant contends that the trial court erred in not suppressing the statements made by appellant at the Homicide Bureau in that the detectives failed to "scrupulously honor," *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), her rights to remain silent and to have an attorney present which she invoked when first informed of her rights under *Miranda.*

This case involves, as did our recent decisions in *Wilson v. United States,* D.C.App., 444 A.2d 25, 27 (1982) (violation of Fifth

Amendment right to remain silent) and *United States v. Alexander,* D.C.App., 428 A.2d 42, 43, 48 (1981) (violation of Fifth Amendment right to counsel) the "second level" of *Miranda* rights. Thus, the question here is

> not whether the appellant was advised of [her] rights but, rather, whether [she] had invoked [her] right to remain silent and, if so, whether the detectives failed to "scrupulously honor," *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), that right by continuing to "interrogate" [her]. If we find that the detectives scrupulously honored that right we must then look to whether the appellant "intentionally relinquish[ed] or abandon[ed]" [her] right to remain silent. [*Id.* at 27–28 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).]

*United States v. Alexander, supra* at 48–49 n. 19, 52 n. 27.

The trial court found that appellant invoked her right to remain silent and to have an attorney present. Finding that conclusion to have been supported by substantial evidence, we affirm it. D.C.Code 1981, § 17–305(a).[5]

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona, supra,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28

---

5. The government contends that appellant, despite responding "No" on a PD 47 card when asked whether she was willing to answer questions without an attorney present, did not effectively invoke her *Miranda* right to an attorney because she did not additionally orally invoke her right. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378 (1981) ("the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel"); *Rhode Island v. Innis,* 446 U.S. 291, 294, 298, 100 S.Ct. 1682, 1686, 1688, 64 L.Ed.2d 297 (1980) (respondent "invoked his *Miranda* right to counsel when he [said] he wished to consult with a lawyer"); *Michigan v. Mosley, supra,* 423 U.S. at 104 n. 10, 96 S.Ct. at 326 n. 10 (quoted language from *Miranda* for the proposition that " 'the interrogation must cease until an attorney is present' " only " '[i]f the individual states that he wants an attorney.' ").

While in these cases the suspects did orally invoke their right to counsel, we do not read them as mandating a separate oral request for counsel as a precondition for an effective invocation of *Miranda* rights. To do so would render the PD 47 card and the questions thereon merely a notice of potential rights and the answers and signatures thereon virtual nullities. *See United States v. Alexander, supra* at 45 (appellee effectively invoked her right to an attorney by answering "No" to the last question on a PD 47 form—"Are you willing to answer any questions without a lawyer present?").

(footnote omitted). We must assess the record in this case to determine whether the detectives, by questioning appellant at the Homicide Bureau regarding the crime, failed to "scrupulously honor" the rights she had invoked.

We are met at the outset with the trial court's rejection of appellant's motion to suppress and its findings that appellant was readvised of her rights at the Homicide Bureau and voluntarily agreed to answer questions at that time. While we may not disturb a trial court's denial of a suppression motion so long as it is supported by substantial evidence, D.C.Code 1981, § 17–305(a), in making this determination we may and do conclude, as a matter of law, that appellant's rights were not scrupulously honored and, therefore, both *Miranda, supra* and *Mosley, supra* required the exclusion of her statement. *See United States v. Alexander, supra* at 50.

In *Mosley,* the Supreme Court noted the factors which are to be considered in determining whether a suspect's right to cut off questioning has been scrupulously honored. They are: 1) was the suspect orally advised of his rights and did he orally acknowledge them; 2) did the police immediately cease questioning and make no attempts to resume or ask him to reconsider; 3) was there a sufficient break (in *Mosley,* two hours) between the first and second interrogations and was the second performed at a different location by a different officer about a different crime and 4) were *Miranda* warnings given before the second questioning session. The Court in *Mosley* answered the questions affirmatively and reinstated his conviction.

Turning to the instant facts, the record reflects that appellant, a twenty-four-year old woman with an I.Q. of 59 and no prior experience with the criminal justice system, was apprised of her rights both at the crime scene, where she invoked them, and at the Homicide Bureau. It also reflects that although Officers Maldonado and Rau ceased questioning appellant, after her invocation, Officer Maldonado transported appellant immediately to the Homicide Bureau where

she knew questioning would be and was resumed. It further reflects that while Officer Maldonado knew that appellant did not wish to speak to anyone about the crime, with or without an attorney present, she did not attempt to obtain counsel for appellant, *see Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981), nor did she inform Detective Aduddell that appellant had earlier invoked her *Miranda* rights. Moreover, the different location to which appellant was delivered was the potentially coercive one of an interview room, where she was immediately met by a detective who initiated the questioning. *See Wilson v. United States, supra* at 29. Under these circumstances, we cannot find that the detectives, in eliciting appellant's written statement, scrupulously honored her rights to remain silent and to an attorney. *Cf. Calaway v. United States,* D.C.App., 408 A.2d 1220 (1979) (confession voluntary when, following an invocation of his right to an attorney and the police having immediately ceased their questioning, appellant initiated questioning about the offense and, in the face of four recitals of his *Miranda* warnings, gave a seven or eight minute long statement); *In re W.B.W.,* D.C. App., 397 A.2d 143 (1979) (confession voluntary when youthful appellant who had been previously arrested, apprised of rights and had benefit of counsel and had earlier refused to answer questions, reinitiated the discussion concerning the crime and reexecuted a PD 47 card before questioning resumed).

We also conclude that appellant's action or lack of action at the Homicide Bureau did not amount to an intentional relinquishment or abandonment of a known right or privilege for Fifth Amendment purposes and that the statements should have been suppressed. *Wilson v. United States, supra* at 30; *United States v. Alexander, supra* at 52. *See Edwards v. Arizona, supra* 451 U.S. at 484, 101 S.Ct. at 1884 ("when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interroga-

tion even if he has been advised of his rights" (footnote omitted)).

*Reversed.*

KERN, Associate Judge, dissenting:

Upon examination of the record, I am unable to agree with the majority's conclusion that appellant's rights were not "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).[1]

The record reflects that appellant, without any questioning by police officers who responded to the scene of the crime, confessed to them that she had stabbed the decedent. (Record at 10, 11, 33, 34.)

Officer Rau, the arresting officer, testified that after appellant *initially* indicated that she did not want to speak without an attorney present, by answering "no" to the third and fourth PD–47 questions, she "continued to make the statement, 'I stabbed him. I stabbed him' ... approximately five or six times ... that was just coming out of her, without any questions from us, whatsoever." (Record at 16–17.) The other officer present testified that appellant "continued to say that she stabbed her boyfriend", despite the fact that no further questions were asked by the arresting officers. (Record at 35.) Appellant's counsel "conceded" that his client's repeated confession on the scene after answering "no" to the two form questions was voluntary. (Record at 148.) Additionally, Detective McCloskey, one of the arresting officers, testified that appellant "seemed to want to relate more information" at the scene of the crime, but was told that conversation would resume later. (Record at 110.)

The homicide detective at headquarters, where appellant was taken, testified that when he met appellant to perform the "standard paperwork relating to preparation of the case for filing in court" (Record at 70), he read her the *Miranda* rights from the standard form. (Record at 72.) The following colloquy between the prosecutor

and the detective occurred at trial. (Record at 73–74):

Q. And after you advised her of her constitutional rights, did she indicate that she was willing to speak with you?

A. Yes.

Q. And did she indicate she was willing to speak to you without the assistance of a lawyer?

A. Yes.

Q. What happened after that time, did you at that time begin to write things down, or did you have a conversation with her?

A. I asked her briefly what happened. She told me in approximately two to five minutes of what transpired.

\* \* \* \* \* \*

A. Following her advice of rights which was taken from the statement form I generally asked a general question to begin a narrative of the sequence of events of an incident, and shortly thereafter, concluding that first paragraph, the narrative, I'll begin a more specific questioning of, to draw out details that have been left out in the narrative.

Q. Did you use that procedure when you talked to Ms. McKeamer?

A. Yes, sir.

Q. And when she gave her narrative of what happened, at any time did she say to you she didn't want to speak to you?

A. No.

Q. Did at any time she request to have the assistance of a lawyer?

A. No.

Q. Did at any time she say she just didn't want to talk any more?

A. No.

The Supreme Court in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), has ruled:

[W]e now hold that when an accused has invoked his right to have counsel present

---

1. I do not disagree with the majority's affirmance of the trial court's conclusion that appellant invoked her right to remain silent and to have an attorney present by answering "no" to

the PD–47 questions posed by Officer Rau when he first arrived at the scene of the crime. (*Infra* at 350 n. 5.)

during custodial interrogation, a valid waiver of that right cannot be established by showing *only* that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [*Id.* at 484, 101 S.Ct. at 1884 (emphasis added).]

The Court went on:

In concluding that the fruits of the interrogation initiated by the police . . . could not be used against Edwards, we do *not* hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. [*Id.* at 485, 101 S.Ct. at 1885 (emphasis added).]

The Court noted:

Various decisions of the Courts of Appeals are to the effect that a valid waiver of an accused's previously invoked Fifth Amendment right to counsel is possible. . . . the rule in the Fifth Circuit is that a knowing and intelligent waiver cannot be found once the Fifth Amendment right to counsel has been invoked unless the accused initiates the renewed contract. . . . Waiver is possible [in the Fifth Circuit] when the request for counsel is equivocal. [*Id.* at 486 n. 9, 101 S.Ct. at 1885 n. 9.]

Mr. Justice Powell commented in his concurrence:

It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. . . .

In sum, once warnings have been given and the right to counsel has been invoked, the relevant inquiry—whether the suspect now desires to talk to police without counsel—is a question of fact to be determined in light of all the circumstances. [*Id.* at 490–91, 101 S.Ct. at 1887–88.]

The majority, relying on the application of factors outlined in *Mosley, supra,* finds that appellant's rights were not "scrupulously honored." As in *Mosley,* however, where the Supreme Court found no violation of *Miranda* rights, appellant was fully advised of her rights at the scene of the crime, and her initial decision not to answer questions was fully respected by all the officers present. In addition, as in *Mosley,* the statements complained of were made after a fresh set of *Miranda* warnings were given in a different location—at the stationhouse. Any differences between *Mosley* and the instant case are not dispositive given "the particular facts and circumstances of the police interrogation" which make clear that appellant had waived her rights by the time she made her statement at the station. *See Peoples v. United States,* D.C. App., 395 A.2d 41 (1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979).

The trial court in the instant case found that "[b]efore any further inquiry was made of the defendant [appellant] at the police station, there was again a full reading of the . . . rights statement . . . . This time she chose not to [decline to answer questions] and before Detective Aduddell questioned her, the Court finds . . . she affirmatively agreed to answer questions at this time." (Record at 149.) The trial court went on to find "from all of the evidence that the statements [at the station and reduced to writing] were voluntarily made after a full advisement of rights which from all of the evidence, appears to have been understood by the defendant [appellant]." (Record at 150.)

Appellant's repeated and concededly voluntary confessions to the police made on the scene *after* having initially answered "no" to the PD–47 questions, coupled with appellant's effort at the scene to relay information to Detective McCloskey (Record at 110) and her affirmative assertions at the police station that she wished to talk, were enough to support the trial court's finding of fact that she had waived her right to have counsel present when she answered questions, and enough to allow the police

officers to ascertain that appellant had reconsidered her original decision not to talk. *See Edwards,* 451 U.S. at 490–91, 101 S.Ct. at 1887–88 (Powell, J., concurring).

The majority also places reliance upon the cases of *Edwards v. Arizona, supra; United States v. Alexander,* D.C.App., 428 A.2d 42 (1981); and *Wilson v. United States,* D.C.App., 444 A.2d 25 (1982). There are two important differences between those cases and the case at bar. First, there is no evidence in any of those cases of the type of voluntary, repeated confessions that took place here to demonstrate that appellant was withdrawing her initial invocation of rights.

Second, in this case, the record reflects *no* additional interrogation or subtle interrogative tactics designed to elicit incriminating statements, during the time between the first and second *Miranda* questionings. *See Rhode Island v. Innis,* 446 U.S. 291, 302–03, 100 S.Ct. 1682, 1690–1691, 64 L.Ed.2d 297 (1980). It is undisputed that Detective Aduddell, who interviewed appellant at the station, was not aware that appellant had previously answered "No" to the final two PD–47 questions. Thus, his actions cannot be construed as not "scrupulously honoring" appellant's rights. *See Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

In *Edwards, supra,* despite the defendant's clear statement to a guard that he did not wish to talk to anyone, the guard replied that the defendant "had" to talk with them and escorted the defendant to meet with detectives who had brought with them a taped statement of an accomplice who had implicated him. 451 U.S. at 479, 101 S.Ct. at 1882. In *Alexander, supra,* within minutes of defendant's invocation of her *Miranda* rights, the detective stated "we know you are responsible for the stabbing," and at a suppression hearing admitted that this was an interrogation technique to get someone to talk. 428 A.2d 42, 45 n. 9. Finally, in *Wilson, supra,* in an attempt to get the defendant to confess, detectives continued to discuss the case despite defendant's remark that he had "nothing to tell."

In the instant case there is no evidence of any interrogation until after appellant changed her answers to *Miranda* questions.

Given these circumstances I would affirm appellant's conviction and dissent from the majority's reversal of the conviction for self-confessed murder.