**Shawn M. STEWART, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 93–CF–620.

District of Columbia Court of Appeals.

Argued Feb. 9, 1995.
Decided Dec. 21, 1995.

858

Steven R. Kiersh, Washington, for appellant.

Mary D. Rodriguez, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, Ronald L. Walutes, Jr., and Renate D. Staley, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, KING and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Shawn Stewart was convicted of second degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license.[1] The trial court denied Stewart's motion to suppress a confession he made to the police after his arrest but before presentment and assignment of counsel. The confession was subsequently admitted into evidence during Stewart's trial. Because we find that the police obtained Stewart's confession in violation of his Fifth Amendment right to remain silent and that use of the confession during trial was not harmless error, we reverse.

## I.

The murder of which Stewart was convicted occurred in the early morning hours of May 30, 1992, at the corner of 7th and L Streets, Northwest. Detective Phineas Young of the Metropolitan Police Department homicide squad was assigned as lead investigator. On July 29, 1992, on the basis of Detective Young's complaint, the Superior Court issued a warrant for Stewart's arrest. At 10:30 a.m. the next day, Detective Young, accompanied by another detective and a uniformed police officer, arrested Stewart at the home where he lived with his parents a few blocks from the scene of the crime.

The officers took Stewart to the homicide squad offices at 300 Indiana Avenue. Upon arrival there, after being advised of his rights, Stewart executed a PD 47 indicating that he waived his rights.[2] The PD 47 was completed at 12:05 p.m.

Stewart gave Detective Young biographical information for the PD 163, the MPD "prosecution report." When Detective Young asked whether Stewart was willing to make a statement, however, Stewart indicated that he did not wish to make any statement. In response to questioning by the trial court, Detective Young testified that he understood that Stewart was willing to talk to him, but not about the crime.

At approximately 3:30 p.m., after the paperwork had been completed in the homicide squad offices, Detective Young started to take Stewart to the central cellblock in the building's basement for fingerprinting and photographing. As Stewart and Detective Young left the squad's offices, they saw Detective Edwin Treadwell, another member of the homicide branch. Detective Treadwell had worked on the case since the date of the homicide, and knew that Stewart was a suspect. Detective Treadwell also had known Stewart personally since Stewart was a little boy. Stewart and Detective Treadwell belonged to the same church, the United House of Prayer for All People, and had been members of that church for their entire lives. Detective Treadwell also knew Stewart's family; as a child, Detective Treadwell had been baby-sat by Stewart's grandmother.

Detective Treadwell accompanied Detective Young and Stewart to the cellblock. Sometime during that trip Detective Treadwell asked whether Stewart had given a statement. In response, Detective Young indicated that Stewart had chosen not to give a statement. There was no further conversation among the three of them.

---

1. The jury acquitted Stewart of attempted robbery while armed.

2. The "PD 47" is a form used by the Metropolitan Police Department to record waiver or assertion of *Miranda* rights. It contains the following questions, followed by boxes in which the arres-

tee indicates his response: "Have you read or had read to you the warnings as to your rights? Do you understand these rights? Do you wish to answer any questions? Are you willing to answer any questions without having an attorney present?"

At the cellblock, Detective Treadwell and Stewart spoke privately.[3] Detective Treadwell gave the following account of the substance of the conversation, which the trial court credited:

[I gave him] words of encouragement. I was telling him that we all make mistakes and not to feel bad about this situation. I had told him that the situation that he was in was not a good situation, but that it was a situation that I was not judging him by and that I felt no one else, meaning other church members, would judge him by, basically telling him that based upon our teachings we don't judge each other, that to keep his head up, to be strong and to remember what we believe in.

According to Detective Treadwell, when he said "mistakes" he was referring to the case. He said that in speaking to Stewart he wanted to let him know "that he wasn't standing alone, that there was still a support group, meaning the church." Detective Treadwell also offered, and Stewart accepted, a picture of their bishop, which Detective Treadwell produced from his identification folder. Detective Treadwell testified that the bishop is to members of their church a source of strength, "someone that when you are in trouble you can always go to." He said that he provided the picture to give Stewart "inspiration and encouragement."

Detective Treadwell knew he could not talk long with Stewart because Stewart had to be processed by the cellblock personnel. While they were together, Detective Treadwell asked Stewart whether he was interested in talking any more with him. Stewart replied that he was.

At the suppression hearing, Detective Treadwell said that he felt his conversation with Stewart was as a member of their church and not as a police officer. He also testified that he believed there were no restrictions on questioning Stewart. Detective

Treadwell did not readvise Stewart of his constitutional rights either before or during the conversation.

After leaving Stewart at the central cellblock, Detective Treadwell and Detective Young departed the station on another assignment, and did not return until late that evening. In the meantime, Stewart remained in the central cellblock, without access to his parents or consultation with an attorney. When the detectives returned, Detective Young brought Stewart up to the homicide squad office. Detective Young testified that at first he was unsure what Stewart wanted to talk to Detective Treadwell about. Detective Treadwell immediately asked Stewart, "What happened?" In response, Stewart began his confession. Neither detective took notes while Stewart confessed. It was only some time after Stewart had begun his confession that Detective Young took over the questioning and started to transcribe the confession onto PD 118 forms, forms used by the MPD to memorialize custodial statements.

Stewart's confession is contained in four PD 118 forms, which were filled out between 11:45 p.m. and 12:49 a.m. Detective Young estimated that the process of questioning Stewart started around twenty or twenty-five minutes earlier. Detective Treadwell was present the entire time and witnessed Stewart's statement. On each of the forms, Stewart signified that he waived his rights. No evidence was presented as to when the waiver portion of the form was completed by Stewart, or whether the waiver questions were ever read to him.[4] In his statement, Stewart said that he was back in the homicide office "[b]ecause I wanted to talk to Mr. Treadwell."

In denying the suppression motion, the trial court found that Stewart had initially chosen not to give a written statement and

---

3. The government did not present any evidence as to who initiated the conversation. Stewart testified that upon reaching the cellblock, Detective Young went to a desk to hand over some paperwork. While Detective Young was at the desk, Detective Treadwell said, "Shawn, come here and let me talk to you for a minute."

4. The closest the government came to asking this question was in the following direct examination of Detective Treadwell:

Q. Did [Stewart] ever in your presence *not* waive any of his rights?

A. No.

(Emphasis added.)

that the choice was a product of his "personal preference." The court found that Detective Young then dropped the subject altogether. The court further found that Stewart did not make a "blanket assertion of his right to remain silent and he did give information to the police except for a written statement about the offense."

Regarding the cellblock conversation, the trial court found that "[w]hen Detective Treadwell ultimately approached the defendant his conversation did not consist of any interrogation about the murder incident. It was purely of a personal nature and the court gives full credence to Detective Treadwell's description of the nature of the conversation." The trial court specifically found that Detective Treadwell was a highly credible witness.

With respect to the interrogation during which Stewart's confession was taken, the trial court found that "[i]t was only after Mr. Stewart indicated on his own a willingness to give a written statement that any questions were asked of him about the murder incident specifically. The court finds that this was a specific change of mind by the defendant and that in any event no statement was actually taken from him until he had been read his rights once again." The trial court specifically found that the police honored Stewart's preference for not giving a written statement and that he chose to give a statement "for his own personal reasons."

## II.

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court "concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. at 1624. Consequently, the Court established certain procedural safeguards to protect the rights of the accused. The Court recognized that the Constitution did not require adherence to any particular solution, but required adherence to the procedures it established in *Mi-*

*randa* until it was shown other procedures at least as effective. *Id.* The warnings and waivers required by *Miranda* are prerequisites to the admission of any statement of the defendant to be used against him, regardless of whether the statement was in fact voluntary. *Michigan v. Mosley*, 423 U.S. 96, 99–100, 96 S.Ct. 321, 324–325, 46 L.Ed.2d 313 (1975); *Miranda, supra*, 384 U.S. at 476, 86 S.Ct. at 1628–1629.

■ The *Miranda* procedures require that, before interrogation, an individual in custody be warned regarding his rights to remain silent and to counsel. *Miranda, supra*, 384 U.S. at 467–68, 471, 86 S.Ct. at 1624–25, 1626. Before an interrogation may begin in the absence of counsel, the suspect must have affirmatively waived the right to counsel. *Id.* at 470, 86 S.Ct. at 1625–26. Similarly, an affirmative waiver of the right to remain silent must be obtained. *Id.* at 475, 86 S.Ct. at 1628 ("[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."); *see also id.* at 468, 86 S.Ct. at 1625 ("[T]he warning [regarding the right to remain silent] will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it."). The government bears the "heavy burden" of establishing a valid waiver. *Id.* at 475, 86 S.Ct. at 1628.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda, supra*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28 (footnote omitted).

When and under what circumstances an interrogation may resume after the suspect has invoked his right to remain silent was addressed by the Supreme Court in *Mosley.* The Court in that case stated that the admissibility of statements made in response to interrogation subsequent to invocation of the right to remain silent "depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley,* 423 U.S. at 104, 96 S.Ct. at 326 (quoting *Miranda,* 384 U.S. at 474, 479, 86 S.Ct. at 1628, 1630). In *McKeamer v. United States,* 452 A.2d 348 (D.C.1982), we noted the four factors identified in *Mosley* that need to be considered in determining whether the defendant's rights have been "scrupulously honored":

> They are: 1) was the suspect orally advised of his rights and did he orally acknowledge them; 2) did the police immediately cease questioning and make no attempts to resume or ask him to reconsider; 3) was there a sufficient break (in *Mosley,* two hours) between the first and second interrogations and was the second performed at a different location by a different officer about a different crime and 4) were *Miranda* warnings given before the second questioning session.

*Id.* at 351; *Wilson v. United States,* 444 A.2d 25, 29 (D.C.1982) (same); *United States v. Alexander,* 428 A.2d 42, 49 (D.C.1981) (same). "The *Mosley* Court envisioned a case-by-case approach involving an inquiry into all of the relevant facts to determine whether the suspect's rights have been re-spected." *United States v. Dell'Aria,* 811 F.Supp. 837, 842 (E.D.N.Y.1993).

When reviewing a trial court's denial of a suppression motion, we may not disturb a trial court's findings of fact if they are supported by substantial evidence. D.C.Code § 17–305(a); *McKeamer, supra,* 452 A.2d at 351. The question whether a defendant's rights were scrupulously honored, including whether police conduct constitutes "interrogation," is a question of law, however. *Derrington v. United States,* 488 A.2d 1314, 1328 (D.C.1985); *McKeamer, supra,* 452 A.2d at 351; *see also (Milton Lee) Davis v. United States,* 564 A.2d 31, 34–42 (D.C.1989) (discussing analysis to be applied in ascertaining whether question is one reviewed for clear error or *de novo* ).[5]

### III.

In the present appeal, Stewart concedes that he initially waived his rights to counsel and to remain silent. He contends, however, that he subsequently invoked his right to remain silent and that the detectives failed scrupulously to honor that invocation. In response, the government contends that Stewart never invoked his right to remain silent, but that if he did, Detective Treadwell's cellblock conversation was not "interrogation"; the government also claims that Stewart subsequently and voluntarily initiated the interrogation during which his confession was obtained.

We count a total of four instances of custodial interrogation, three of them within the

5. We note that there is a split among the federal circuits as to the appropriate standard for reviewing a trial court's determination on whether police conduct constituted "interrogation" for the purposes of *Miranda. Compare United States v. Payne,* 954 F.2d 199, 203 (4th Cir.1992) ("substantial deference") *and United States v. Poole,* 794 F.2d 462, 465 ("de novo"), *amended,* 806 F.2d 853, 853 (9th Cir.1986) ("clearly erroneous") *with United States v. Taylor,* 985 F.2d 3, 7 n. 5 (1st Cir.1993) ("plenary review") *and United States v. Calisto,* 838 F.2d 711, 717 (3rd Cir. 1988) ("plenary review"). The weight of reasoned authority appears to be with the less deferential standard of review. Both *Taylor* and *Calisto* relied principally on the opinion in *Poole* prior to *Poole*'s amendment. The *Poole* court, in turn, relied on its decision in *United States v. McConney,* 728 F.2d 1195 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), which set out a comprehensive method for determining the appropriate standard of review similar to (and relied upon in) this court's analysis in *(Milton Lee) Davis, supra.* The amended opinion in *Poole,* on the other hand, engaged in no analysis, and its citation to *McConney* is cryptic at best, given that in *McConney* the Ninth Circuit concluded that *de novo* review applied to the question whether exigent circumstances justifying a no-knock entry existed. 728 F.2d at 1205. *Payne* reasoned that the inquiry is "necessarily contextual" and depends on "circumstances ... too numerous to catalogue." 954 F.2d at 203. Although those facts are relevant to the *Davis–McConney* approach, they do not exhaust the pertinent factors. *See Davis,* 564 A.2d at 36–37 (cataloguing considerations); *McConney,* 728 F.2d at 1201–02 (same).

approximately nine-hour period after Stewart invoked his right to remain silent. After giving biographical information, Stewart invoked his right to remain silent when first interrogated about the offense by Detective Young. The second interrogation took place in the cellblock when Detective Treadwell, within an hour of Stewart's assertion of the right to remain silent, talked with Stewart about their shared religious values. That conversation ended with Stewart answering "yes" to Detective Treadwell's invitation to continue their conversation later. The third interrogation occurred about eight hours later, after Stewart's processing was completed and the detectives had returned to the station. Detective Young, acting upon the earlier "yes" obtained from Stewart by Detective Treadwell during the cellblock conversation, took Stewart to Detective Treadwell, who immediately asked him about the crime without first giving Stewart fresh *Miranda* warnings. Then, after Stewart started to talk about the crime, he was interrogated for the fourth time that day, when Detective Young took the contested written confession. All three interrogations occurred during the time that the police were under a duty scrupulously to honor Stewart's right to remain silent, concerned the same crime for which Stewart had been arrested (and about which he already had been interrogated by Detective Young), and included Detective Treadwell; the last two of the three interrogations also included Detective Young, were in the same place as the first interrogation of the day, and occurred within minutes of each other. We cannot conclude, based on this record, that the police "scrupulously honored" Stewart's right to remain silent.

### A.

### The booking interrogation

▆ Relying on the trial court's findings, the government contends that Stewart never effectively asserted his right to remain silent. The trial court's finding that Stewart's assertion of the right to remain silent was limited to written statements is not, however, supported by substantial evidence. There was no evidence introduced that Stewart at any time orally discussed the offense when he

was first brought to the homicide squad office. Detective Young specifically and repeatedly testified that he understood Stewart to be refusing to discuss the events in question. In fact, he was not even certain that Stewart wanted to discuss the charges when he brought Stewart upstairs to see Detective Treadwell that night. It was not until Stewart actually started to speak in response to Detective Treadwell's direct question that Detective Young decided that Stewart wanted to discuss the incident.

▆ In light of Detective Young's testimony, we conclude that Stewart effectively asserted his right to remain silent. We do not need to address the trial court's conclusion that Stewart did not make a "blanket assertion of his right to remain silent." Where the officer understands that the suspect has asserted his right to remain silent, the fact that someone else could have believed otherwise, or been confused, is irrelevant.

Our reliance on the subjective perception of the interrogator is consistent with the rationale of *(Robert L.) Davis v. United States,* — U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In *Davis* the defendant had been read his rights and had expressly waived them. *Id.* at ——, 114 S.Ct. at 2353. An hour and a half into his interrogation, however, the defendant said, "Maybe I should talk to a lawyer." *Id.* In response, the interrogators made it clear that if he wanted a lawyer, they would stop. *Id.* The defendant then said that he was not asking for a lawyer and that he did not want a lawyer. *Id.* An hour later, he said "I think I want a lawyer before I say anything else." *Id.* At that point the interrogation stopped. *Id.*

In *Davis* the Supreme Court held not only that it was appropriate for the interrogators to ask the defendant for clarification of his statement, but also that because the request for counsel was ambiguous, the interrogators were free to disregard it. *Id.* at ——, ——, 114 S.Ct. at 2355, 2356. The Court reasoned that the inquiry as to whether a request was made is an objective one to "avoid difficulties of proof and to provide guidance to officers conducting interrogations." *Id.* at ——, 114

S.Ct. at 2355. The Court expressed concern for effective law enforcement and voiced sympathy with the "police officers who must actually decide whether or not they can question a suspect." *Id.* at ——, 114 S.Ct. at 2356. If questioning had to cease after an ambiguous statement, "[p]olice officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he hasn't said so, with the threat of suppression if they guess wrong." *Id.*

▬ The Court in *Davis* was concerned with the predicament of police officers faced with ambiguous or equivocal statements. A police officer who *understands* a statement as a clear invocation of the right is in no position to plead such a quandary and should not benefit from a rule designed to avoid it. Moreover, a suspect undergoing interrogation, required by *Davis* to make his assertion of his rights unambiguous in the face of continued questioning, should not also have to anticipate that a court may find his statements ambiguous although his interrogator does not.[6]

## B.

### Detective Treadwell's "words of encouragement" in the cellblock

▬ Since we conclude that Stewart invoked his right to remain silent, from that moment on, the police were under an obligation to "scrupulously honor" Stewart's invocation of his right. Applying the standard prescribed by the Supreme Court, we find that Detective Treadwell's cellblock conversation with Stewart was "interrogation" for

the purpose of *Miranda,* and that the interrogation violated the *Mosley* standards. The Supreme Court defined "interrogation" for *Miranda* purposes in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court held that "interrogation"

> refers not only to express questioning, but also to any *words or actions* on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

*Id.* at 301, 100 S.Ct. at 1689–90 (footnotes omitted); *see also Derrington, supra,* 488 A.2d at 1326 (discussing *Innis* ).

In *Innis,* the Court specifically noted that *Miranda* was addressed not only to direct questioning, but also to "the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' " *Id.* 446 U.S. at 299, 100 S.Ct. at 1689 (quoting *Miranda, supra,* 384 U.S. at 450, 86 S.Ct. at 1615) (emphasis added) (alteration in original). The Court also noted,

> Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in deter-

---

6. In its brief, the government adverts to a proffer it made during the suppression hearing to the effect that, if recalled as a witness, Detective Young would testify that Stewart was always responsive *during questioning,* but that *when the* options of videotaped and written statements were explained to him, Stewart did not want either. Detective Young never testified, however, that Stewart answered any question about the events of May 30, 1992; in fact Detective Young, under questioning from the court, said that Stewart was *not* willing to answer questions regarding the event.

   When Detective Young was called to testify at trial, he testified that he got some "basic infor-

mation" from Stewart. On cross-examination, he admitted that during the initial interview, Stewart changed his mind and said he did not want to give a statement. Detective Young conceded that he honored Stewart's request not to make any further statements.

   We think that the government's proffer is immaterial. "[W]here in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated." *Miranda, supra,* 384 U.S. at 475–76, 86 S.Ct. at 1628.

mining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.

*Id.* 446 U.S. at 302 n. 8, 100 S.Ct. at 1690 n. 8.

Applying the *Innis* standard to the record in this case—that is, looking at the facts from the point of view of what the police should have known would be the impact of the statements and, most importantly, how the suspect perceived them—Detective Treadwell's cellblock conversation constituted interrogation. Detective Treadwell had known Stewart since Stewart was a small child. He knew that Stewart was religious and in fact belonged to the same church and knew him from that church. As described by Detective Treadwell himself, the words he used minimized the moral seriousness of Stewart's alleged crime by saying that Stewart would not be judged regarding it. He also told Stewart that "we all make mistakes." His conversation was one that was admittedly designed to "encourage" a suspect who had been frightened, a fright which originally had caused Stewart to be silent, not garrulous. Regardless of whether Detective Treadwell thought he was speaking as a fellow churchmember of Stewart's, he either knew or should have known that his words of "inspiration" were likely to elicit an incriminating response.[7] The fact that Stewart, who had not wanted to speak earlier when Detective Young questioned him, responded affirmatively when Detective Treadwell asked whether he wanted to talk some more, shows that Stewart was receptive to Detective Treadwell's religious approach.[8]

The government contends that the cellblock conversation should be characterized as "spontaneous" or "casual," and the trial judge labelled it as "purely of a personal nature." We think that, on this record, the conversation can not properly be characterized as spontaneous, casual or personal. The conversation was not spontaneous because Detective Treadwell did not talk to Stewart until after they had gone from the homicide squad's offices to the cellblock and then, only after Detective Young had left their presence. Nor was the conversation merely incidental, because Detective Treadwell specifically asked Stewart whether he would be willing to speak to him later, clearly inviting a follow-up discussion. Detective Treadwell was an experienced homicide detective, investigating Stewart's case, and capable of exploiting an opportunity. No conversation concerning a criminal investigation between such a detective and a suspect can be said to be "purely personal." Detective Treadwell's conversation can only be characterized as the first preparatory step of someone experienced in conducting interrogations. In this case, the police knew exactly what would work.

Detective Treadwell's cellblock interrogation was not a proper restart of questioning under the *Mosley* factors. Stewart did not initiate the interrogation. There had been only a short lapse of time since Stewart's invocation of his right to remain silent. The interrogation concerned the same crime. Detective Treadwell did not readvise Stewart of his rights, nor did Stewart waive them.[9]

---

7. The Court in *Innis* noted that the term "incriminating response" means *any* response that the prosecution seeks to introduce at trial. 446 U.S. at 302 n. 5, 100 S.Ct. at 1690 n. 5.

8. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the "Christian burial speech" case, is not directly applicable to this case because it was a Sixth Amendment right-to-counsel case. *Innis, supra,* 446 U.S. at 300, 100 S.Ct. at 1689. It is worth noting, however, that in *Brewer,* an appeal to religious sensibilities was found to be improper questioning when done in the absence of counsel.

9. The parties have disputed whether Detective Treadwell knew that Stewart had asserted his right to remain silent. Detective Young testified that Stewart had invoked his right to remain silent. What Detective Treadwell actually learned from Detective Young regarding Stewart's invocation of the right is immaterial, because police officers have a duty to communicate such information to their colleagues. *See McKeamer, supra,* 452 A.2d at 351 (reversing denial of suppression motion where detective failed to inform colleague who conducted interrogation that appellant had earlier invoked her *Miranda* rights).

## C.

### The late-night questioning back in the squad room

█ Our inquiry does not end with our conclusion that Detective Treadwell's conversation in the cellblock constituted an improper interrogation. "It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Innis, supra,* 446 U.S. at 303, 100 S.Ct. at 1691. In the present case, Stewart's confession did not occur until approximately eight hours after Detective Treadwell's cellblock interrogation. Nevertheless, when reviewed in the totality of the circumstances, Stewart's confession was a product of questioning in violation of the *Miranda* rule.

█ Detective Young brought Stewart upstairs to the homicide office from the cellblock because Stewart had requested to talk to Detective Treadwell. In ordinary circumstances where the police have scrupulously honored a person's right to cut off questioning, such a request would likely constitute a waiver. In the present case, however, Stewart's request was in response to Detective Treadwell's invitation during the improper interrogation at the cellblock. Therefore, we cannot consider it to operate as a waiver. *See McKeamer,* 452 A.2d at 350 ("*If* we find that the detectives scrupulously honored that right [to remain silent] we must then look to whether the appellant intentionally relinquished or abandoned her right to remain silent." (internal quotations, citations, and alterations omitted) (emphasis added)); *Wilson, supra,* 444 A.2d at 29 n. 7 ("In light of the detectives' deliberate and ultimately successful attempts to induce the appellant's incriminatory statement, our finding that their attempts amounted to an interrogation and our conclusion that the detectives failed to scrupulously honor the appellant's Fifth Amendment rights, it would be inconsistent for us to hold that the appellant independently and insistently initiated, nurtured and guided the discussions."); *cf. Miranda, supra,* 384 U.S. at 476, 86 S.Ct. at 1629 ("[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.").

In the absence of an independent request by Stewart, the third interrogation of the day was also improper under the *Mosley* factors. The interrogation was not preceded by any warnings or waivers, but began with Detective Treadwell's direct question, "What happened?" The interrogation occurred in front of the same detectives who had earlier interrogated him, concerned the same crime, and took place at the same location as his first interrogation that same day. The only *Mosley* factor weighing in the government's favor is the lapse of eight hours between the second and third interrogations. If that alone were sufficient, however, the other *Mosley* factors, including the requirement that fresh warnings be given, would irrationally be rendered immaterial. Moreover, those eight hours have to be evaluated taking into account the individual's circumstances. Here, a young man with no previous record, after spending eight hours in the cellblock without contact with his parents or an attorney, responded to unwarned questioning by the one person he knew, a fellow church member who had earlier offered him comfort and encouragement. In those circumstances, the lapse of eight hours, without more, was insufficient to satisfy *Mosley.*

█ Turning to the written confession, it is by no means clear that before it was taken, the police warned Stewart of his *Miranda* rights and Stewart intentionally waived them. Moreover, even if that had been done before the police began their transcription, it would not change the result in this case because by that time, the police had already been questioning Stewart for at least twenty minutes. As noted above, we look for a waiver only if the defendant's right to cut off questioning was "scrupulously honored." In the present case, it was not. Applying again the *Mosley* factors to the questioning at the point the fresh warnings might have been given yields the conclusion that the questioning was improper. There was virtually no lapse in time from the previous interrogation, and no change in subject, personnel or place. " 'To permit the continuation of custodial interrogation after a momentary cessation

would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned.'" *Peoples v. United States,* 395 A.2d 41, 44 n. 7 (D.C.1978) (quoting *Mosley, supra,* 423 U.S. at 102, 96 S.Ct. at 321). With respect to this fourth and last interrogation, the only possible *Mosley* factor favoring the government would be fresh *Miranda* warnings. By themselves, however, they are insufficient. *Cf. Peoples,* 395 A.2d at 44 (affirming admission of statement where interview by detective occurred only after (1) arrestee had been taken before a judicial officer; (2) he had requested the interview; (3) it had been six hours since his last session; (4) he had just been reread his *Miranda* rights).[10] Had the government established that fresh *Miranda* warnings were properly given at the outset of the nighttime interrogation in the squad office, the police would have met its obligations under *Mosley,* and we would now affirm. Because *Miranda* warnings were not timely given—if they were given at all—Stewart's confession should have been excluded because it was acquired in violation of his Fifth Amendment rights.

### IV.

▮▮ Having found that Stewart's confession was erroneously admitted, we conclude that we must reverse the conviction because the denial of the suppression motion was not beyond a reasonable doubt "harmless constitutional error." *Chapman v. California,* 386 U.S. 18, 20, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967). The testimony of Stewart's alleged robbery partners, who served as witnesses for the government, was hopelessly contradictory. In fact, it is likely that the jury relied primarily on Stewart's confession of the murder,[11] of which he was convicted, because it acquitted him of the attempted robbery charge, which had no support in Stewart's confession. The confession was the only piece of evidence implicating Stewart in the murder that did not also directly support the robbery charge, because it contained nothing concerning Stewart's intent to rob when he "stuck" the gun in the window of the decedent's car. If the jury did not give sufficient credit to the testimony of the government's witnesses, in conjunction with Stewart's admission that he pointed a gun in the victim's face, to find Stewart guilty of attempted robbery, there is at least a reasonable doubt as to whether Stewart's confession had an effect on the jury's verdict finding Stewart guilty of murder.

*Reversed and remanded.*[12]

FARRELL, Associate Judge, concurring.

I join Judge Ruiz's opinion, and write only to emphasize what for me is the decisive

---

10. *Peoples* bears some resemblance to this case in that the questioning resulting in the contested statement was preceded by two concededly improper resumptions of questioning. *Id.* at 43. *But see id.* at 43 n. 5 (questioning whether the government's concession was correct). The fact pattern in *Peoples,* however, was complicated by the fact that the concededly improper questioning occurred in Maryland, by Maryland police regarding both Maryland and District of Columbia crimes. *Id.* at 42–43. The statement at issue, however, was made to a District police officer regarding the District crime. *Id.* at 43. The appellant apparently did not attempt to argue a causal connection between the two improper sessions in Maryland and the District session. *See id.* at 43–44. Moreover, there were substantial lapses of time between the improper interrogation, the defendant's request to speak to the District officer, and the interrogation that elicited the incriminating statement. *Id.* at 42–43.

11. Stewart's statement related the following:
    We were up at the playground, so we went down to 7th and L Street, Northwest and they were behind the tree. So I went up to the car and his window was open and I stuck the pistol in his window. He looked like he tried to smack it and I grabbed and he grabbed my hand and then pulled out into the street and the gun went off. I jumped and ran in the house and went into my room and went to bed.
    Later in the statement, Stewart said that he and the man in the car did not say anything to one another.

12. In his separate statement, our colleague suggests that on remand the government should have an opportunity to supplement the record with respect to when Stewart received additional *Miranda* warnings. We do not think that is appropriate. First, the government has not requested a remand for that or any other purpose. Second, the government was on notice in the trial court that it had the burden to show that it had "scrupulously honored" Stewart's right to remain silent. Evidence of fresh *Miranda* warnings is identified in *Mosley* as a factor to be taken into account. Third, the question quoted in note 4, *supra,* as well as the government's presentation of other evidence of the circumstances sur-

factor requiring reversal. Our task is to apply *Michigan v. Mosley*'s test of whether the police "scrupulously honored" appellant's assertion of his right to remain silent. That test, of course, does not mean what it says, for if the police truly had to be scrupulous—punctiliously exact—in heeding the defendant's refusal to talk, their required behavior would be indistinguishable from what *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requires when the defendant has asserted the right to have counsel present. Instead, as applied uniformly by the courts of appeals, the *Mosley* standard permits further interaction between the police and the suspect and evaluates it case-by-case by applying multiple factors gleaned from the *Mosley* decision, none of which alone is decisive. Given this totality of the circumstances test [1] so very different from *Edwards'* bright-line prophylactic rule, it is not surprising that *Mosley* analysis "can produce opposite results in cases that are similar in some respects," *Charles v. Smith*, 894 F.2d 718, 726 (5th Cir.1990), and can divide reasonable minds.

But, notwithstanding this malleability, if the phrase "scrupulously honored" is to have *any* rigor it means that we must resolve all doubts about whether the police respected the defendant's assertion of his right to silence against the government. In this case, that means that on the close question of whether Detective Treadwell "interrogated" appellant in the cellblock area by invoking their common religious affiliation and obtaining his assent to later conversation (while not directly mentioning nor asking him about the crime), the balance must tip to an affirmative answer. (I agree that, under our decisions, whether or not there has been "interrogation" under *Innis* is ultimately a legal question for this court to decide). Even so, affir-

mance would be proper were only a single fact different in this case. Had the detectives, on returning to the station and escorting appellant to the homicide office, immediately re-advised him of his *Miranda* rights, the preceding eight-hour period during which they left him by himself unquestioned would have neutralized Treadwell's cellblock interrogation for purposes of *Mosley* analysis. But, as Judge Ruiz explains, that did not happen. Instead the police immediately asked him to relate "[w]hat happened" and he began talking about what obviously was the crime. Only then, after a lapse of a half hour or more, did they obtain a waiver before taking his formal statement. *This* pre-warning interrogation, on top of Treadwell's earlier invocation of their religious bond, yields the critical mass of police conduct [2] that violated *Mosley*'s command. As Judge Ruiz's opinion is consistent with this analysis, I join it.

Separate opinion by Associate Judge KING.

KING, Associate Judge:

I write separately, not because I disagree with my colleagues' analysis, but because I am not convinced that the record before us is sufficiently complete to permit the ultimate conclusion reached by them. The majority is of the view that the government had an opportunity to make the necessary record and since it did not do so, it is bound by any deficiencies that resulted. While I agree that the government had the burden of showing that it "scrupulously honored" Stewart's exercise of his right not to give a statement, it did all that it was required to do under the ground rules applicable as the issue was framed in the trial court. *See Michigan v.*

rounding the midnight interrogation, convince us that the government was fully aware of the need to present evidence concerning subsequent warnings. The fact that the government failed to present more evidence than it did only suggests to us that the government had exhausted the evidence favorable to its position. Given the foregoing, permitting the government to relitigate the issue would be neither fair nor efficient.

1. "[T]he *Mosley* Court envisioned a case-by-case approach involving an inquiry into all of the

relevant facts...." *United States v. Dell'Aria*, 811 F.Supp. 837, 842 (E.D.N.Y.1993).

2. As the decisions make clear, under *Mosley* "the central focus ... is the conduct of the law enforcement authorities" rather than the voluntariness of the *Miranda* waiver or confession. *Dell'Aria, supra*, 811 F.Supp. at 842; *see also United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir.1992).

*Mosley,* 423 U.S. 96, 100, 96 S.Ct. 321, 324–25, 46 L.Ed.2d 313 (1975). In this court, however, the issue has been framed differently, and the majority's decision is based upon a factor that was not considered to be at issue during the hearing on the motion.

Briefly, the testimony revealed that Stewart was arrested in his home just before noon and taken to the homicide office where he was read his *Miranda* [3] rights by Detective Young using police form PD 47. Stewart answered "yes," in writing, to all four questions on that form including the one indicating that he was willing to answer questions without having an attorney present. He then signed and dated the form. He orally told Detective Young, however, that he did not wish to make a statement and no questions concerning the offense were asked of him. Detective Young did ask routine biographical questions that Stewart answered. At about 3:30 p.m., Stewart was taken to the cellblock where the encounter with Detective Treadwell took place as recounted by Judge Ruiz in her opinion. Thereafter the detectives became involved in another case; they did not return their attention to Stewart until much later in the evening when he was brought to the homicide office where, at about 11:45 p.m., he gave the statement which is in controversy.

In seeking suppression of this statement the defense theory has been a moving target. One ground was advanced in the written motion to suppress, a second was litigated in the hearing on the motion in the trial court, and a third surfaced, for the first time, during oral argument in this court. For example, when defense counsel filed the motion to suppress, he was under the impression that the written statement had been taken immediately after the PD 47 form was executed. The ground for suppression, as expressed in the written motion, was that Stewart, eighteen years old at the time with no prior contact with the criminal justice system, and having just been forcibly removed from his home, was so shaken that he did not make a knowing and intelligent waiver of his rights. Although the defense presented two witnesses in support of that theory, it was not

pressed because Detective Young's testimony revealed what really occurred: after signing the completed PD 47 indicating otherwise, Stewart told Young he did not wish to talk; Stewart later had the conversation with Treadwell in the cellblock; and, the written statement was actually taken much later in the evening.

With this new information, the focus of the hearing then became what occurred during the course of Stewart's conversation with Treadwell. Treadwell, who had not been scheduled to testify because he knew less than Detective Young did concerning the issue raised in the written motion, was then called to give his version of the events in the cellblock. The defense position was that Treadwell's conversation with Stewart was itself an interrogation that violated the "scrupulously honored" edict. The trial court ruled otherwise, however. Throughout the discussion of this issue by counsel and the court it was assumed that, after the cellblock encounter, Stewart initiated the reopening of discussion of the case with the detectives. It was never contended that the failure to give "fresh warnings" had any bearing on the admissibility of the confession, and no questions were asked of either officer in that regard. Indeed, the defense did not raise that point in either its motion for reconsideration to the trial court or in its brief in this court. The question of "fresh warnings," however, did arise, for the first time, during oral argument in this court. The majority now holds that because the government did not demonstrate that "fresh warnings" were given, it has failed to establish that the police "scrupulously honored" Stewart's exercise of his right to remain silent.

I do not at this stage reach the same result my colleagues do because of the defect in the record. I suspect, however, reading between the lines, that the government will not be able to establish either that "fresh warnings" were given, or that Stewart, in some fashion and of his own volition, made it clear that he had changed his mind and now wished to talk about the circumstances of the offense. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 310–11, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(1985). Under the circumstances presented here, however, if the government is able to make either showing, it should be given the opportunity to do so. Therefore, I would reverse and remand, essentially for the reasons set forth by Judge Ruiz and Judge Farrell; however, reversal would be conditioned upon the trial court allowing the government to present whatever relevant evidence it may have bearing on this point.