# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
John O. Juroszek

## PEOPLE v WHITE

Docket No. 144387. Argued October 11, 2012 (Calendar No. 8). Decided February 13, 2013.

Kadeem Dennis White was charged in the Jackson Circuit Court with first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b, in connection with the shooting death of Benjamin Willard. Before trial, defendant moved to suppress his inculpatory statements to the police. He argued that the statements should be suppressed because they were made after he had asserted his right to remain silent and in response to the statements of a police officer that constituted the functional equivalent of interrogation under *Rhode Island v Innis*, 446 US 291 (1980). The court, Thomas D. Wilson, J., granted the motion to suppress, finding that although the officer's statements did not constitute express questioning, the officer's statements were the functional equivalent of questioning. The prosecution appealed by delayed leave granted. The Court of Appeals, WILDER and MURRAY, JJ. (SHAPIRO, P.J., dissenting), reversed, concluding that the officer's statements did not constitute the functional equivalent of questioning given that (1) before defendant made his inculpatory statements, the officer had advised defendant that he was not asking defendant a question, but was only telling him that he hoped the gun used in the charged offense was in a place where no one could find it and be hurt, (2) nothing in the record indicated that the officer was aware of any peculiar susceptibility of defendant, and (3) the officer had not made a lengthy speech. 294 Mich App 622 (2011). The Supreme Court granted defendant's application for leave to appeal. 491 Mich 890 (2012).

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justice ZAHRA, the Supreme Court *held*:

Defendant was not subjected to express questioning or its functional equivalent after he invoked his right to remain silent, and the Court of Appeals correctly reversed the trial court's decision to suppress defendant's voluntary statements.

1. Under the Fifth Amendment of the United States Constitution, no person shall be compelled in any criminal case to be a witness against himself or herself. The United States Supreme Court held in *Miranda v Arizona*, 384 US 436 (1966), that to protect that right, when the police continue to interrogate a suspect in custody after the suspect has invoked the right to remain silent and the suspect confesses as a result of the interrogation, the confession is inadmissible. The term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and

custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect.

2. In this case, defendant was in custody. He was not, however, subjected to express questioning. A question asks for or invites a response. The officer's comment concerning the location of the gun did not ask for or invite a response, but was a mere expression of hope and concern. Nor did the addition of the words "okay" and "all right" at the end of the comment transform it into a question. The officer used the words repeatedly during the colloquy to indicate when he had finished a thought. Additionally, before making the comment, the officer informed defendant that he was not asking defendant questions. The officer's statement in that regard made it less likely that the officer would have reasonably expected defendant to answer with an incriminating response. Further, defendant's subsequent statement did not concern the gun's location, reinforcing the conclusion that the officer's comment was not a question. That conclusion is also reinforced by the fact that the officer seemed surprised by defendant's inculpatory statements.

3. Nor was defendant subjected to the functional equivalent of questioning. There was nothing in the record to suggest that the officer was aware that defendant was peculiarly susceptible to an appeal to his conscience concerning the safety of others. The mere fact that defendant was 17 years old and inexperienced with the criminal justice system did not mean that defendant was peculiarly susceptible. The fact that the officer was speaking directly to the defendant was also not determinative given that the police did not carry on a lengthy harangue in defendant's presence and given that the officer's comment was not particularly evocative. Defendant was not interrogated in violation of *Miranda*, and his confession was admissible and had to be made fully available to the jury.

Affirmed.

Justice CAVANAGH, dissenting, would have reversed the judgment of the Court of Appeals and reinstated the trial court's order suppressing defendant's inculpatory statements. Assuming for the sake of argument that defendant was not subjected to express questioning, the officer's statements amounted to the functional equivalent of express questioning. The majority focused too heavily on the similarities in the content of the statements in *Innis* and this case and failed to give proper consideration to the context in which the statements were made. The primary considerations of *Innis* are the suspect's perception of the officer's statements and whether the officer should have known that his or her comments were reasonably likely to elicit an incriminating response. In this case, unlike in *Innis*, the officer's statements were made in a police interrogation room and were expressly directed to defendant, the only other person present. Regardless of whether the officer subjectively expected defendant to respond to his statements, defendant could have reasonably perceived that the officer was seeking a response, and the officer should have known that it was reasonably likely that defendant would respond. The use of psychological ploys by the police may also constitute interrogation. In this case, the officer's statements had the characteristics of a psychological ploy that exerted a compelling influence on defendant because they played to the likelihood that defendant would feel compelled to protect others. Defendant's youth and inexperience with the criminal justice system also increased the likelihood that he would feel compelled to respect and comply with the

officer as an authority figure and would perceive the officer's statements as requiring a response. As a result, defendant was improperly subjected to the functional equivalent of express questioning.

Justice MARY BETH KELLY, dissenting, would have reversed the judgment of the Court of Appeals and suppressed defendant's statement because the officer engaged in the functional equivalent of express questioning by exploiting defendant's youth, a characteristic that made him particularly susceptible to the officer's compulsive techniques. The United States Supreme Court has spoken extensively about the unique characteristics of minors, explaining that they are generally wanting in maturity, are more susceptible to outside influences, and often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. They are uniquely susceptible to police interrogative efforts and should reasonably be expected to respond to those efforts. Given these unique characteristics, minors have long been afforded a special regard in the law. In the custodial-interrogation context, these characteristics require courts to exercise special care in their scrutiny of the record. In this case, the officer should have recognized that defendant's age made him especially susceptible to subtle compulsive efforts and that such conduct would likely elicit an incriminating response. Examined in their entirety, the officer's remarks included a number of police tactics to which a youth would be readily susceptible. Accordingly, defendant was subjected to interrogation after he invoked his right to remain silent.

Justice MCCORMACK took no part in the decision of this case.

©2013 State of Michigan

# Opinion

Chief Justice:     Justices:

Robert P. Young, Jr.   Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack

FILED FEBRUARY 13, 2013

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                    No. 144387

KADEEM DENNIS WHITE,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except MCCORMACK, J.)

MARKMAN, J.

The issue here is whether, in violation of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), defendant was subjected to "interrogation" or, more specifically, "express questioning or its functional equivalent," *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980), after he invoked his right to remain silent. Because we agree with the Court of Appeals that defendant was not subjected to such questioning after he invoked his right to remain silent, we affirm the

judgment of the Court of Appeals, which correctly reversed the trial court's decision to suppress defendant's voluntarily given confession.

## I. FACTS AND PROCEDURAL HISTORY

Defendant allegedly turned a drug buy into an armed robbery by pulling out a gun instead of proffering cash. He and the victim allegedly struggled over the gun, the gun went off, and the victim was killed. Defendant was then taken into custody. After a police officer read defendant his *Miranda* rights, the following colloquy, which was recorded on a DVD, immediately ensued:

> [*Officer*]: Okay. This is what they call the acknowledgement and waiver paragraph. I'm going to read this to you. If you wish to talk to me, I'm going to need you to sign and date [the] form. Even though you sign and date the form, you still have your rights to stop at any time you wish. Do you understand that?

> [*Defendant*]: No. No thank you sir. I'm not going to sign it.

> [*Officer*]: Okay. Okay. Sounds good.

> [*Defendant*]: I don't even want to speak.

> [*Officer*]: I understand. I understand Kadeem. Okay then. The only thing I can tell you Kadeem, is good luck man. Okay. Don't take this personal. It's not personal between me and you, I think I may have had one contact with you on the street. Okay. I've got to do my job. And I understand you've got to do what you've got to do to protect your best interests. Okay. The only thing that I can tell you is this, and I'm not asking you questions, I'm just telling you. I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay. All right.

> [*Defendant*]: I didn't even mean for it to happen like that. It was a complete accident.

> [*Officer*]: I understand. I understand. But like I said, you, uhh, you get your attorney, man. Hey, look dude, I don't think you're a monster, all

right. I don't think that. You could have came down to me and turned yourself in and there ain't no damn way I'd beat you up. Yeah. Okay, man? You all set, you straight with me? Who knows you're here? Who knows of your family? Because I know a lot of your family in town now.

[*Defendant*]: I know that I didn't mean to do it. I guarantee that, I know I didn't mean to do it.

[*Officer*]: Does your dad know you're down here?

[*Defendant*]: Yeah.

Defendant was charged with first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b. Before trial, defendant moved to suppress his statement to the police officer. The trial court granted defendant's motion, finding the officer's comment-- "I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it"-- to be the functional equivalent of express questioning, which is prohibited after a defendant has invoked his right to remain silent. In a published, and split, decision, the Court of Appeals reversed. *People v White*, 294 Mich App 622; 823 NW2d 118 (2011). The majority held that the officer's comment did not constitute the functional equivalent of express questioning under *Innis* and thus that there was no constitutional violation. The dissent would have suppressed the confession because, with the word "okay" appended to his expression of concern regarding the firearm, the officer's comment constituted an express question. At the very least, the dissent concluded, the officer's comment constituted the functional equivalent of a question and was thus prohibited. This Court granted defendant's application for leave to appeal. *People v White*, 491 Mich 890 (2012).

3

## II. STANDARD OF REVIEW

Because the pertinent facts here are undisputed, we review de novo the trial court's decision regarding whether defendant was subjected to "interrogation" or, more specifically, "express questioning or its functional equivalent." *Innis*, 446 US at 300-301. We agree with the Court of Appeals dissent that the majority erred by applying the "clear error" standard of review in evaluating whether such questioning occurred. As the dissent explained, given that the facts are undisputed, the de novo standard of review, not review for clear error, is applicable. See *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001) ("To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo."). However, this error was harmless because the majority held that "[e]ven under a de novo review of the evidence, . . . we conclude, as did the trial court, that no express questioning occurred." *White*, 294 Mich App at 633.

## III. ANALYSIS

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V. See also Const 1963, art 1, § 17. Notwithstanding the apparent textual focus of the Fifth Amendment on whether a defendant's confession was undertaken voluntarily and without coercion,[1] the United States Supreme Court has held since

---

[1] Before *Miranda*, the admissibility of a confession depended on its voluntariness. See *Bram v United States*, 168 US 532, 542-543; 18 S Ct 183; 42 L Ed 568 (1897) ("'[A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied

4

*Miranda* that in the context of a "custodial interrogation," advising a defendant of his *Miranda* rights[2] is necessary to protect his constitutional privilege against self-incrimination, and "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 US at 444, 473-474. If the police continue to "interrogate" the defendant after he has invoked his right to remain silent, and the defendant confesses as a result of that "interrogation," the confession is inadmissible. *Id.* at 444-445. However, *Miranda* also clarified that voluntarily given confessions that are not the result of impermissible custodial interrogations remain admissible:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. [*Id.* at 478.]

---

promises, however slight, nor by the exertion of any improper influence.'") (citation omitted); *Hardy v United States*, 186 US 224, 229; 22 S Ct 889; 46 L Ed 1137 (1902) ("[S]tatements which are obtained by coercion or threat or promise will be subject to objection."); *Malloy v Hogan*, 378 US 1, 7; 84 S Ct 1489; 12 L Ed 2d 653 (1964) ("[T]he constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary . . . .'").

[2] That is, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 US at 444.

In this case, there is no question that defendant was in "custody" and that after defendant was read his *Miranda* rights, he invoked his right to remain silent. Thus, the question here is whether, after defendant invoked his right to remain silent, he was then subjected to "interrogation."

In *Innis*, 446 US at 300-302, the United States Supreme Court explained the circumstances under which a defendant is deemed to have been subjected to "interrogation":

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [Emphasis in the original.]

The Court further explained, however, that the underlying intent of the police is not irrelevant:

> [I]t may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect. [*Id.* at 301 n 7.]

6

But again, as one academic commentator explained, the focus must be on the objective manifestation of the officer's words rather than on the officer's subjective intentions in speaking the words:

> [T]he best reading of the *Innis* test is that it turns upon the *objective* purpose *manifested* by the police. Thus, an officer "should know" that his speech or conduct will be "reasonably likely to elicit an incriminating response" when he should realize that the speech or conduct will probably be viewed by the suspect as designed to achieve this purpose. To ensure that the inquiry is entirely *objective*, the proposed test could be framed as follows: if an objective observer (with the same knowledge of the suspect as the police officer) would, on the sole basis of hearing the officer's remarks, infer that the remarks were designed to elicit an incriminating response, then the remarks should constitute "interrogation." [2 LaFave, Criminal Procedure (3d ed), § 6.7(a), p 757, quoting White, *Interrogation Without Questions: Rhode Island v. Innis and United States v. Henry*, 78 Mich L R 1209, 1231-1232 (1980) (emphasis in the original).]

On the basis of the foregoing principle, *Innis* concluded that the defendant was not "interrogated" within the meaning of *Miranda*. The defendant had been suspected of robbing and killing taxicab drivers with a sawed-off shotgun. When the police arrested him, they repeatedly read him his *Miranda* rights, and the defendant invoked his right to counsel. On the way to the police station, the defendant was in the backseat of a squad car accompanied by three officers. The officers were having a conversation and one of them stated that there were "a lot of handicapped children running around in this area" because a school for handicapped children was located nearby, and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Innis*, 446 US at 294-295. In the course of this conversation, the officers were interrupted by the defendant, who directed them to turn the squad car around so that he could show them where the gun was hidden.

7

The Court held that the defendant had not been "interrogated" in violation of *Miranda* because he was neither subjected to "express questioning" nor its "functional equivalent." Regarding the latter, the Court noted that (1) "[t]here is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children"; (2) "[n]or is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest"; (3) "the entire conversation appears to have consisted of no more than a few offhand remarks"; (4) "[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect"; (5) "[n]or does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.'" *Id.* at 302-303. Finally, the Court held that the lower court had "erred . . . in equating 'subtle compulsion' with interrogation" because even when there is subtle compulsion, "[i]t must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id*. at 303.

In the instant case, we agree with the Court of Appeals that defendant was not subjected to "express questioning" after he invoked his right to remain silent. First, a "question" asks for or invites a response. *Id.* at 302 (holding that the respondent was not subjected to "express questioning" because "no response from the respondent was invited"); *Random House Webster's College Dictionary* (2001) (defining "question" as "a sentence in an interrogative form addressed to someone in order to get information in reply" or "the act of asking or inquiring"). The officer's comment in this case-- "I hope

8

that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it"-- was not a question because it did not ask for an answer or invite a response. It was a mere expression of hope and concern.

Second, the officer's addition of the words "okay" and "all right" at the end of his comment did not transform a non-question into a question. This is especially obvious when the conversation is considered in its entirety, as it must be, because the officer *repeatedly* used the words "okay" and "all right" in a manner that failed to garner any response from defendant. See *Acosta v Artuz*, 575 F3d 177, 191 (CA 2, 2009) ("*Innis* calls upon courts to consider police conduct in light of the totality of the circumstances in assessing whether the police 'should have known' that their actions 'were reasonably likely to elicit an incriminating response.'"), quoting *Innis*, 446 US at 303. We agree with Justice CAVANAGH that

> it is not unusual for people to use certain words or phrases repeatedly while speaking without intending for those words to have significant meaning. In fact, during the approximately five-minute-long colloquy between Stiles and defendant, Stiles repeatedly used the phrases "okay" and "all right" to punctuate statements, apparently without intending to extract a response from defendant. [*Post* at 4.]

Indeed, the officer used the word "okay" 17 times during the 5-minute conversation, and yet defendant only "responded" 3 times, including the "response" that is at issue in this case, and the other 2 "responses"-- if that is even a proper characterization of what defendant's statements amounted to-- were simply "yeah" and "okay." Similarly, the officer used the phrase "all right" 4 times during the 5-minute conversation and only in this one instance did defendant again "respond," and, as discussed later in this opinion, that "response" was in no way responsive to the officer's statement because defendant

9

said nothing about the gun-- the very matter that had been the subject of the officer's statement. Moreover, from our own review of the video of the interview, the officer's comment, at least in our judgment, does not at all *sound* like a question. That is, the officer did not say the words "okay" and "all right" in a manner and with an emphasis that would have made a reasonable person believe that a response was expected. Instead, the use of these words reflected essentially a verbal tic on the officer's part meaning, "Okay, all right, I have finished my thought."

Furthermore, immediately before the officer made the statement at issue, he said, "I'm not asking you questions, I'm just telling you." Although this is certainly not dispositive of whether what follows constituted a "question," it is nevertheless relevant with regard to whether the officer reasonably should have expected an answer. The very utterance itself made it less likely either that the officer would have reasonably expected defendant to answer with an incriminating response *or* that defendant would have proffered an incriminating response.[3]

Moreover, as previously noted, the fact that defendant's "response" to the officer's comment concerning the location of the gun did not have anything at all to do with the

---

[3] We generally agree with Justice CAVANAGH that although "such statements do not magically transform what would otherwise be an express question into a constitutionally benign comment," "such qualifying statements might, in some situations, be relevant to a court's consideration of the totality of the circumstances . . . ." *Post* at 3. Indeed, we believe that such prefatory language will *almost always* be of at least *some* relevance to the court's "totality of circumstances" analysis in the sense that, whatever the subjective intentions of the officer, his disclaimer that no question is being asked, and thus that no answer is expected, can be assumed to have at least *some* deterrent effect on a defendant in answering the "question" on the assumption that the officer means what he says.

location of the gun also reinforces the conclusion that the officer's comment here was not a question. If it was a question, defendant certainly did not answer it. Instead, defendant said: "I didn't even mean for it to happen like that. It was a complete accident." If defendant was answering the *officer's* "question," one would think that he would have said something about the location of the gun, but he did not, and this, in our judgment, underscores that the officer's comment was not a question to begin with.

In addition, the fact that the officer responded to defendant's incriminating statement by saying, "[Y]ou, uhh, you get your attorney, man," and then asking defendant if his family knew that he was there, suggests that the officer was not expecting or trying to obtain an incriminating response from defendant. Instead, it seems that the officer was taken somewhat by surprise by defendant's incriminating statement, and he immediately sought to veer the conversation away from any further incriminating statements. The fact that the officer was caught off guard by defendant's incriminating statement further underscores that the officer's comment was not "designed to elicit an incriminating response . . . ." *Innis*, 446 US at 302 n 7.

Finally, to the extent that the officer's statement can even be reasonably viewed as a question, this particular question does not seem intended to generate an incriminating response.[4] Instead, if anything, the officer was simply trying to ensure that defendant heard and understood him. As the Court of Appeals explained:

---

[4] The Court of Appeals dissent stated that "it is difficult to conceive of another reason" for the officer to have said what he did other than to get defendant to make an incriminating statement. *White*, 294 Mich App at 639 (SHAPIRO, P.J., dissenting). However, perhaps the officer was simply *genuinely* concerned about somebody getting hold of the gun and injuring either themselves or somebody else. Just as

11

[W]e conclude, as did the trial court, that no express questioning occurred. After defendant invoked his right to remain silent, the detective informed defendant that he was not asking any more questions and was only going to make a statement. The brief statement was made, and though the detective stated "okay" and "alright" after the statement, the video makes clear that in context the detective was seeking affirmation that defendant heard the statement, not that he was seeking a response to the statement. And the detective's response once defendant blurted out an incriminating statement shows he had not intended that there be any sort of substantive response to the statement. Consequently, there was no express questioning of defendant. [*White*, 294 Mich App at 633-634.]

We further agree with the Court of Appeals that defendant was not subjected to the "functional equivalent" of express questioning after he invoked his right to remain silent. Just as in *Innis*, there is nothing in the record to suggest that the officer was aware that

---

"in *Innis*, there is a basis for concluding that the officer's remarks were made for some purpose *other* than that of obtaining evidence from the suspect" because an "objective listener could plausibly conclude that the policemen's remarks in *Innis* were made solely to express their genuine concern about the danger posed by the hidden shotgun." [2 LaFave at 757 n 20, quoting White, 78 Mich L R at 1234-1235 (emphasis in the original).]

See also *Innis*, 446 US at 303 n 9 ("[I]t was 'entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other.") (alterations in the original). Furthermore, given that after the officer said something about the gun, he asked defendant if his family knew where he was, perhaps the officer was hoping that defendant might tell a family member where the gun was if it was not in a safe location so that a family member could ensure that the gun was moved to a safe location. Finally, "the mere fact that a police officer may be aware that there is a 'possibility' that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation." *United States v Taylor*, 985 F2d 3, 8 (CA 1, 1993), citing *Arizona v Mauro*, 481 US 520, 528-529; 107 S Ct 1931; 95 L Ed 2d 458 (1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself."). Contrary to Justice CAVANAGH's intimation, we fully recognize that the officer's subjective intent is not dispositive. However, as *Innis*, 446 US at 301 n 7, explained, such intent is not "irrelevant" either, and it is especially not "irrelevant" when a dissenting Court of Appeals judge has specifically asserted that the officer *must* have subjectively intended to coerce defendant to respond to the officer's comments.

defendant was "peculiarly susceptible to an appeal to his conscience" concerning the safety of others. *Innis*, 446 US at 302. Justice CAVANAGH asserts that the officer's comment about the gun "played to the likelihood that defendant would respond to an *expression of concern for the safety of others*." *Post* at 17 (emphasis added). However, we have a difficult time fathoming that the officer believed that defendant was "peculiarly susceptible to an appeal to his conscience," especially where defendant had just been arrested for shooting another man to death for drugs. That is, under these circumstances, and absent any evidence of defendant's peculiar susceptibility, we are not persuaded that the officer here should have known that "defendant would perceive the [officer's] comments as compelling a response in order to protect others . . . ." *Post* at 19.

Although Justice CAVANAGH states that "several of defendant's individual personal characteristics increased the likelihood that he would perceive Stiles's comments as requiring a response," *post* at 21, he only articulates two such characteristics: "defendant's youth and inexperience with the criminal justice system," *post* at 20. However, the mere fact that defendant was 17 years old and inexperienced in the criminal justice system does not mean that he was "peculiarly susceptible to an appeal to his conscience" or "unusual[ly] susceptib[le] . . . to a particular form of persuasion . . . ." *Innis*, 446 US 302.[5] Indeed, not even defendant himself has argued that

---

[5] In the case relied on heavily by Justice MARY BETH KELLY-- *JDB v North Carolina*, 564 US __; 131 S Ct 2394, 2398, 2406; 180 L Ed 2d 310 (2011), which, unlike the instant case, involved a 13-year-old boy-- the United States Supreme Court held that although "the age of a child subjected to police questioning is relevant to the custody

13

he possesses any personal characteristics that made it more likely that he would feel compelled to respond to the officer's comment about the gun. And indeed, as previously discussed, defendant never did truly "respond" to the officer's comment about the gun-- he never told the officer where the gun was. Therefore, the alleged importunings of the officer with regard to the safety of other persons must not have moved defendant excessively or weighed too heavily on his conscience.[6]

Also, just as in *Innis*, there is nothing in the record to suggest that the officer here was aware that defendant was "unusually disoriented or upset at the time of his arrest." *Innis*, 446 US at 303. Furthermore, the officer only made a single remark about the gun. "This is not a case where the police carried on a lengthy harangue in the presence of the suspect." *Id*. Nor was the officer's remark "particularly 'evocative.'" *Id*. Indeed, the officer's comment in the instant case was far less "evocative" than the officer's comment in *Innis*. In *Innis*, the officer said, "[T]here's a lot of handicapped children running

_____

analysis of *Miranda*," "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case."

[6] Justice KELLY contends that we focus exclusively on the officer's comment about the gun and ignore his "references to violence and attempts to earn defendant's trust through expressions of understanding and references to defendant's family." *Post* at 7 n 20. The only purported "reference to violence" was the officer's statement: "You could have came down to me and turned yourself in and there ain't no damn way I'd beat you up." That is, the officer said that he would *not* have beat defendant up. Accordingly, the officer's statement is probably better understood as a reference to *nonviolence* than to violence. And while it is true that the officer did refer to defendant's family and did render expressions of understanding, we hardly believe that these statements transformed a non-interrogation into an interrogation. Nor do we do not believe that police officers violate the United States Constitution by rendering expressions of understanding to suspects or by inquiring as to whether their families are aware that they are in custody.

14

around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." *Id.* at 294-295. In the instant case, the officer said, "I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it . . . ." Unlike the officer in *Innis*, the officer here did not invoke God or handicapped children. And even if the officer's remark could be considered "subtle compulsion," *Innis* held that "subtle compulsion" is not "interrogation." *Id.*[7]

Justice CAVANAGH is correct that the instant case is factually distinguishable from *Innis* in the sense that the officers in *Innis* were talking to themselves, and not directly to the defendant, about the gun, whereas in the instant case, the officer was clearly talking directly to defendant about the gun given that defendant was the only other person in the room.[8] However, we do not believe that this difference alone requires a different

---

[7] Contrary to Justice CAVANAGH's contention, *Mauro* did not hold that subjecting a suspect to "psychological ploys" constitutes "interrogation." *Post* at 15-16. *Mauro* simply noted that the defendant in that case had *not* been subjected to "psychological ploys." *Mauro*, 481 US at 529. This by no means indicates that "psychological ploys" necessarily constitute "interrogation." Indeed, as previously discussed, *Innis*, 446 US at 303, expressly held that "subtle compulsion" does not constitute "interrogation." See also *Acosta*, 575 F3d at 189 (stating that "police conduct would not qualify as interrogation simply because it 'struck a responsive chord' in a defendant"), quoting *Innis*, 446 US at 303. Furthermore, we do not view what happened here as a "psychological ploy" at all. Justice CAVANAGH contends that "the record is devoid of any support for the majority's speculation regarding Stiles's subjective intent in making the statements at issue." *Post* at 12 n 2. However, the record is equally devoid of any contrary subjective intent, and why should an officer of the law expressing concern about the risk to others being posed by an abandoned firearm be presumed to be engaged in a "psychological ploy"? Why can't it be presumed, absent more, that the expression of such a concern is sincere and genuine and an altogether legitimate aspect of the officer's professional responsibilities? Indeed, it is difficult to imagine a more legitimate concern that an officer of the law might express.

[8] Justice CAVANAGH relies heavily on *In re EG*, 482 A2d 1243 (DC, 1984), for the proposition that whether the officer was talking directly to the defendant is a significant

15

outcome.[9]  As the Court of Appeals explained, "federal courts have repeatedly held that revealing evidence or other facts directly to the defendant does not constitute the

---

factor.  In *In re EG*, the officer was told that a man wearing a beige hat and dark sunglasses had just committed an armed robbery.  When the officer stopped the defendant and found a beige hat and dark sunglasses in the defendant's pocket, the officer said: "Here is the sunglasses and the hat.  I wonder where the gun and money is [sic]."  *Id.* at 1245.  The defendant responded, "I gave it to my partner."  *Id.*  The District of Columbia Court of Appeals held that the officer's statement constituted "interrogation" because "there was no understandable explanation for [the officer's] rhetorical question other than to elicit a response from appellant."  *Id.* at 1248.  In the instant case, however, as previously discussed, there is a reasonable explanation for the officer's comment other than to elicit an incriminatory response from defendant-- a genuine and legitimate concern about the danger posed by the missing gun.  *In re EG* is also distinguishable from the instant case because in that case, the defendant was never told that he had a right to remain silent, while in the instant case defendant was informed that he had a right to remain silent, he invoked that right, and before the officer made the comment about the gun he specifically told defendant that it was a statement, not a question.  Finally, in *In re EG*, the officer made the comment while his service revolver was drawn and the defendant had his hands on the roof of the officer's police cruiser, while here the officer made the comment during a completely civil conversation with defendant at the police station.  Therefore, not only is *In re EG*, of course, not binding on this Court, but it is also distinguishable on significant grounds.

[9]  Contrary to Justice CAVANAGH's contention, we do not "fail[] to give proper consideration to the *context* in which the statements were made."  *Post* at 9-10 (emphasis in the original).  Instead, we are fully cognizant that the officer's comments at issue here were made in a distinct context from those at issue in *Innis,* because while the officer in *Innis* was speaking to another officer, the officer here was speaking to the defendant himself.  However, this appears to be the only contextual difference relied on by Justice CAVANAGH (other than that the defendant in *Innis* was in a police car, while the defendant here was in a police interrogation room, which we believe is a distinction without a meaningful difference)*,* and for the reasons explained above, we do not believe that this distinction by itself, although certainly a distinction, compels a different result.  And contrary to Justice CAVANAGH's intimation, the fact that two of the *dissenting* justices in *Innis* opined that the officer's "remarks 'would obviously have constituted interrogation if they had been explicitly directed to respondent'" is of little relevance because they were *dissenting*.  *Post* at 11, quoting *Innis*, 446 US at 305 (Marshall, J., dissenting).  What *is* relevant is that the *majority* in *Innis* did not rely on the fact that the

16

functional equivalent of questioning, absent any of the other *Innis* criteria." *White*, 294

Mich App at 635. For example, in *Fleming v Metrish*, 556 F3d 520, 523 (CA 6, 2009),

when an officer told the suspect after the suspect had invoked his right to remain silent

that "things did not look good for him and that 'maybe he needed to do the right thing'"

and asked the suspect if he now wanted to talk to the lead detective, the court held that

this did not constitute "interrogation." The court specifically rejected that there was a

significant distinction between the officers' conversation in *Innis* and the comments

directed to the defendant:

> We recognize that *Innis* is arguably distinguishable on the basis that the conversation in *Innis* occurred between two police officers, and was not directed toward the suspect himself. Officer Clayton's brief remarks were, in contrast, clearly aimed at Fleming. Such a distinction might be significant if an officer's brief remarks morphed into, for example, a "lengthy harangue" because, other things being equal, extended comments directed toward a suspect are more likely to elicit an incriminating response. But this court has previously rejected a constitutional challenge to cursory comments aimed at a suspect in an analogous context. See *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir.2000) (holding that "the mere statement by [a law-enforcement official] that 'we've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation under the circumstances."). [*Id.* at 527 (alteration in the original).]

Indeed, "courts have generally rejected claims . . . that disclosure of the results of a lineup

or other inculpatory evidence possessed by the police, without more, constitutes

'interrogation' under *Innis*." *Acosta*, 575 F3d at 191. See, for example, *Easley v Frey*,

433 F3d 969, 974 (CA 7, 2006) (holding that informing the defendant that an eyewitness

---

officers were not talking directly to the defendant in its analysis of whether the officers subjected the defendant to the functional equivalent of express questioning.

was willing to testify against him and that if convicted he could be subject to the death penalty did not constitute "interrogation"); *United States v Payne*, 954 F2d 199, 203 (CA 4, 1992) (holding that informing the defendant that a gun was found at his home did not constitute "interrogation"); *Shedelbower v Estelle*, 885 F2d 570, 572-573 (CA 9, 1989) (holding that informing the defendant that his accomplice had been arrested and that the victim had identified him as one of her assailants after being shown his photograph did not constitute "interrogation"); *People v McCuaig*, 126 Mich App 754, 760; 338 NW2d 4 (1983) (holding that "the statements made by the police officer, which merely advised defendant of the crime with which he was charged and which described the events which led to that charge, cannot be characterized as further interrogation by the officer or its functional equivalent"); *People v Kowalski*, 230 Mich App 464, 467-469, 483; 584 NW2d 613 (1998) (holding that informing the defendant that his accomplice had given a statement and inquiring whether the defendant still wanted an attorney did not constitute "interrogation").

Accordingly, direct statements to the defendant do not necessarily constitute "interrogation."[10] Again, the dispositive question is whether the "suspect's incriminating response was the product of words or actions on the part of the police that they should

---

[10] Although we recognize that none of the cited decisions fully addresses the specific circumstances at issue here-- few criminal cases are factually identical-- these decisions are nonetheless helpful in resolving the present question because they all stand in common for the proposition that direct statements to a defendant do not necessarily constitute "interrogation." Therefore, the fact that the statement at issue here was a direct statement to defendant cannot, by itself, support Justice CAVANAGH's conclusion that the officer's statement constituted "interrogation."

have known were reasonably likely to elicit an incriminating response." *Innis*, 446 US at 303. And for the reasons set forth, we do not believe that defendant's incriminating response in this case can be characterized as such a product. As the Court of Appeals explained:

> [N]othing in the record suggests that the detective was aware of any peculiar susceptibility of defendant (or that he even had any). So, focusing on what defendant would have perceived from the statement in its context, we can only conclude that Detective Stiles should not have reasonably expected defendant to make an incriminating statement. After all, Detective Stiles had already told defendant both that he was not asking a question and that he understood defendant's invocation of his right to remain silent. Amidst these other permissible comments—and absent any known sensitivities of defendant—it would not be reasonable to conclude that the one comment about the possibility of the gun being located and endangering others would result in a statement about the crime itself. Just as importantly, this "is not a case where the police carried on a lengthy harangue in the presence of" defendant, nor was Detective Stiles's comment "evocative." *Innis*, 446 US at 302-303. And these latter two points make any distinction between a direct remark made to defendant and a defendant overhearing remarks between police as in *Innis* insufficient to come to a different constitutional conclusion. [*White*, 294 Mich App at 632.]

## IV. CONCLUSION

For these reasons, we agree with the Court of Appeals that defendant was not "interrogated" in violation of *Miranda*. Therefore, we affirm the judgment of the Court of Appeals, which reversed the trial court's decision to suppress defendant's voluntarily given confession. Defendant's confession must be made fully available to the jury in its pursuit of the truth with regard to what occurred in this case.

Stephen J. Markman
Robert P. Young, Jr.
Brian K. Zahra

19

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 144387

KADEEM DENNIS WHITE,

      Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

This case raises the issue of whether defendant, who was 17 years old at the time, was subjected to "interrogation" after invoking his Fifth Amendment right against compelled self-incrimination, contrary to *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In my view, defendant was improperly subjected to the "functional equivalent" of interrogation under *Rhode Island v Innis*, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980); thus, I would reverse the judgment of the Court of Appeals, reinstate the trial court's order suppressing defendant's incriminating statements, and remand this case to the trial court for proceedings consistent with this opinion.

The United States and Michigan Constitutions guarantee the right against compelled self-incrimination. US Const, Am V; Const 1963, art 1, § 17. The United States Supreme Court has explained that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

privilege against self-incrimination." *Miranda*, 384 US at 444. The necessary "procedural safeguards" are embodied in the now familiar *Miranda* warnings. *Innis*, 446 US at 297; *Colorado v Spring*, 479 US 564, 572; 107 S Ct 851; 93 L Ed 2d 954 (1987).

The United States Supreme Court has "consistently . . . accorded a liberal construction" to the privilege against self-incrimination, *Miranda*, 384 US at 461, while still recognizing that "[c]onfessions remain a proper element in law enforcement" and "[v]olunteered statements of any kind are not barred by the Fifth Amendment," *id*. at 478. Indeed, not all statements obtained by the police after a person has been taken into custody are automatically considered the product of interrogation. *Innis*, 446 US at 299. Rather, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300. However, if at any time "the individual indicates in any manner . . . that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 US at 473-474.

In this case, it is undisputed that defendant was in custody, was given *Miranda* warnings, and had invoked his right to remain silent before he made incriminating statements. Thus, the primary issue in this case is whether defendant was subjected to custodial interrogation after invoking his right to remain silent. The United States Supreme Court has explained that interrogation includes "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *id*. at 444; see, also, *Yarborough v Alvarado*, 541 US 652, 661; 124 S Ct 2140; 158 L Ed 2d 938 (2004), but, in subsequent opinions, the Court has further explained that "interrogation" is not limited only to express questioning. Rather, certain "techniques of persuasion" may also amount to

2

interrogation.  *Innis*, 446 US at 299.  Accordingly, "interrogation" includes either "express questioning or its functional equivalent."  *Id.* at 300-301.

Although caselaw provides little guidance regarding how to determine whether specific statements by the police amount to express questioning, *Innis* explained that if a police officer's statement does not invite a response from the suspect, the statement does not amount to express questioning.  *Id*. at 302.  Although a communication asking someone for an answer obviously amounts to express questioning because it is a clear example of a remark that invites a response, *Innis* should not be interpreted to mean that only explicit or direct questions can amount to express questioning because other types of statements may also invite a response.  Accordingly, police officers cannot remove their comments from the realm of express questioning merely by prefacing the comments with limiting phrases such as "I'm not asking you questions" or "I'm just telling you," as Detective Brett Stiles did in this case.  Although such qualifying statements might, in some situations, be relevant to a court's consideration of the totality of the circumstances, in my view merely prefacing a statement with "I'm not asking a question," "I'm just telling you," or other similar phrases should not be given significant weight because such statements do not magically transform what would otherwise be an express question into a constitutionally benign comment.  For example, the statement "I'm not asking you a question, I'm just telling you I want to know why you killed those people" would clearly be an express question under *Miranda* and *Innis* because it invites a response, regardless of the interrogator's use of a lead-in statement.  See *Innis*, 446 US at 302.

Turning to the unique details of the statements at issue in this case, several characteristics of Stiles's statements indicate that he was asking an express question of

3

defendant. First, defendant and Stiles were the only two people in the interrogation room when Stiles made the statements. Thus, Stiles was obviously directing his statements to defendant. Second, when considered in context, the phrases "okay" and "all right" seem to invite defendant to respond by, at a minimum, acknowledging that he heard what Stiles had said. Third, after punctuating his statements with "okay," Stiles paused for several seconds, as if waiting for a response from defendant. When defendant did not respond, Stiles followed up by stating, "All right?" which, again, could be interpreted as inviting a response from defendant.

On the other hand, I agree with the majority that other characteristics of Stiles's statements weigh against the conclusion that the statements amounted to express questioning. Most notably, it is not unusual for people to use certain words or phrases repeatedly while speaking without intending for those words to have significant meaning. In fact, during the approximately five-minute-long colloquy between Stiles and defendant, Stiles repeatedly used the phrases "okay" and "all right" to punctuate statements, apparently without intending to extract a response from defendant.

As the preceding discussion reveals, the totality of the circumstances surrounding Stiles's statements allows for persuasive arguments in support of differing conclusions regarding whether Stiles subjected defendant to express questioning. However, I will assume arguendo, for purposes of this appeal only, that defendant was not subjected to express questioning because I believe that even if Stiles's comments were not "express questions," the comments nevertheless amounted to the "functional equivalent" of express questioning for the reasons discussed later in this opinion.

4

The "functional equivalent" of express questioning encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 US at 301. An "incriminating response" is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id*. at 301 n 5. *Innis* further explained that the requirement that the words or action be reasonably likely to elicit an incriminating response

> focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. [*Id.* at 301.]

However, the police "cannot be held accountable for the unforeseeable results of their words or actions . . . ." *Id.* at 302. Accordingly, "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.*

The *Innis* Court made two additional important points regarding the definition of "interrogation." First, the Court stated that although the suspect's perception is the primary focus of the inquiry, the intent of the police is also relevant because "it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 301 n 7. Indeed, "where a police practice is designed to elicit an incriminating response from the accused, it is

5

unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.*

Second, in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor . . . ." *Id.* at 302 n 8.

Several opinions provide some examples that assist in establishing the boundaries of "interrogation" under the "functional equivalent" analysis for *Miranda* purposes. For example, in *United States v Payne*, 954 F2d 199, 202 (CA 4, 1992), the court concluded that "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for *Miranda* purposes." Likewise, *Acosta v Artuz*, 575 F3d 177, 191-192 (CA 2, 2009), cited several cases supporting the premise that, generally, disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, does not constitute interrogation under *Innis*. See, also, *United States v Moreno-Flores*, 33 F3d 1164, 1169 (CA 9, 1994) (holding that the defendant was not interrogated when police informed him that drugs had been seized and that he "was in serious trouble"), *People v McCuaig*, 126 Mich App 754, 760; 338 NW2d 4 (1983) (finding no interrogation when an officer advised the defendant of the charges he was facing and described the events that resulted in the charge), and *Fleming v Metrish*, 556 F3d 520, 533 (CA 6, 2009) (permitting comments explaining the inculpatory evidence possessed by the police so that the suspect could "reassess his situation" and "make informed and intelligent assessments of [his] interests") (quotation marks and citation omitted) (alteration in original).

6

The common thread running through these cases is that the police generally do not interrogate a suspect for purposes of *Miranda* if the comments merely provide the suspect with additional information about the course of the investigation and allow the suspect to reconsider his or her decision to invoke the right to remain silent. I agree with the majority that these cases are helpful to the extent that they show that some limited communication with the suspect regarding the case after the invocation of the Fifth Amendment right to remain silent may be permissible under *Miranda*. However, the general principle established by these cases does not, alone, resolve this case because Stiles's expression of concern regarding the gun's location "did not provide defendant with information about the charges against him, about inculpatory evidence the police possessed, or about witness statements." *White*, 294 Mich App at 638 n 5 (SHAPIRO, J., dissenting). Nor did his comments "offer any new information that could provide a basis for an intelligent reassessment of the defendant's decision to remain silent." *Id*. Accordingly, applying this line of cases to conclude that Stiles's comments were not the functional equivalent of interrogation would erroneously expand the analysis beyond its intended scope of applicability.

Although Stiles's comments do not fall into the categories of statements that are generally outside the scope of interrogation, I agree with the majority that this fact alone is not sufficient to label the comments "interrogation" under *Innis*. Rather, it is necessary to consider the *Innis* definition of "interrogation" in greater detail. Particularly important to deciding this case is (1) whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response from defendant and (2) how

7

defendant perceived the comments, regardless of Stiles's intent. See *Innis*, 446 US at 301; see, also, *Stewart v United States*, 668 A2d 857, 866 (DC, 1995) (explaining that applying *Innis* requires a court to "look[] at the facts from the point of view of what the police should have known would be the impact of the statements and, most importantly, how the suspect perceived them").

The defendant in *Innis* was suspected of a murder committed with a gun, which had not been recovered. The defendant, who was under arrest and had been given *Miranda* warnings, was riding in a police car with three officers when one officer commented to another officer that there were many handicapped children in the area where the defendant was arrested. The officer further commented that he hoped that none of the children found the gun and hurt themselves. The second officer expressed his agreement. The defendant overheard the officers' conversation and told the officers to turn the car around so that he could lead them to the gun. The Court concluded that the officers' conversation did not amount to the functional equivalent of interrogation, explaining that the officers' comments occurred in the context of a "brief conversation" that "consisted of no more than a few offhand remarks." *Innis*, 446 US at 303. The *Innis* Court also noted that the officers' comments did not constitute a "lengthy harangue in the presence of the suspect," nor were the comments "particularly 'evocative.'" *Id.* Accordingly, *Innis* held that the suspect "was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." *Id*.

In this case, the majority relies on its conclusion that the content of Stiles's comments was similar to the content of the officers' conversation in *Innis* to support reversing the trial court's suppression of defendant's incriminating statements. The majority emphasizes that, in *Innis* and in this case, the officers expressed concern regarding the whereabouts of a gun and the potential danger that it posed to others, and it notes that neither *Innis* nor this case presents a situation in which the officers engaged in a "lengthy harangue."

While the majority is correct that there are some similarities between the officers' statements in *Innis* and Stiles's comments in this case, those similarities are not determinative. Rather, those similarities are only some of the facts that must be considered in order to determine how defendant perceived Stiles's statements and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response. See *United States v Allen*, 247 F3d 741, 765 (CA 8, 2001) ("Determining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given."), vacated on other grounds 536 US 953 (2002). Thus, the mere fact that the statements have some similar content is not determinative: *all* the circumstances of each case must be considered when applying the principles enunciated in *Innis*.

The majority's singular focus on the similarities in the *content* of the statements in *Innis* and this case fails to give proper consideration to the *context* in which the

9

statements were made. And, in failing to consider the import of the context in which Stiles made the statements at issue, the majority all but ignores the primary considerations of the *Innis* case: the suspect's perception of the officer's statements and whether the officer should have known that his comments were reasonably likely to elicit an incriminating response. Specifically, it is critical to recognize that, unlike the comments in *Innis*, Stiles's comments were made in a police interrogation room and were expressly directed to defendant, who was the only other person present when the statements were made. See *Allen*, 247 F3d at 765 (emphasizing the context in which the statements are made). This factor is significant in determining whether Stiles should have reasonably expected that defendant would make an incriminating response. Indeed, in *In re EG*, 482 A2d 1243, 1245 (DC, 1984), the court considered a situation in which an officer who was investigating an armed robbery arrested the defendant and, when no other officers were present, stated, "I wonder where the gun and money is." *In re EG* compared the officer's statements to the officers' statements in *Innis* and concluded "without reservation that [the officer] should have known that his statement was reasonably likely to elicit an incriminating response . . . ." *Id.* at 1248. *In re EG* differentiated the officer's statements from the *Innis* officers' statements by noting that "no other person was present" and that "there was no understandable explanation for [the officer's] rhetorical question other than to elicit a response from [the suspect]." *Id.* *In re EG* reached this conclusion despite the officer's testimony that he did not expect a response to his statement, explaining that "the definition of interrogation 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'" *Id.* at

10

1248 n 6, quoting *Innis*, 446 US at 301. Accordingly, regardless of whether Stiles subjectively expected defendant to respond to his comments, defendant could have reasonably perceived that, given the content and context of the comments, Stiles was seeking a response.

Similarly, two of the dissenting justices in *Innis*, who were "substantially in agreement with the Court's definition of 'interrogation,'" *Innis*, 446 US at 305 (Marshall, J., dissenting), concluded that the *Innis* officers' remarks "would obviously have constituted interrogation if they had been explicitly directed to respondent," *id.* at 306.[1] This is true because the difference between overhearing a conversation and being the intended recipient of a comment is significant. Specifically, one who overhears a conversation in which he or she is not involved is unlikely to perceive that conversation as seeking his or her input. Conversely, when a comment is expressly directed at someone, the person to whom the comment is directed is reasonably likely to perceive that comment as seeking a response. Conversation does not, however, necessarily require that each participant in the conversation pose an explicit question in order for a response to be reasonably expected.

---

[1] I disagree with the majority that Justice Marshall's *Innis* dissent is irrelevant. See *ante* at 16 n 9. Because Justice Marshall's dissent substantially *agreed* with the majority's definition of "interrogation," *Innis*, 446 US at 305 (Marshall, J., dissenting), both opinions applied the same legal framework and simply reached differing conclusions regarding the specific facts at hand. Thus, I believe that Justice Marshall's opinion, while not binding, is relevant and worthy of some consideration as this Court weighs the totality of the circumstances in this case.

11

Rather than considering how the context affected defendant's perception of Stiles's statements and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response, the majority prefers to speculate regarding Stiles's subjective intent in making the statements and concludes that the statements merely reflected a "concern about the danger posed by the missing gun." *Ante* at 16 n 8. See, also, *ante* at 12 n 4 (speculating that Stiles intended for his comments to spur defendant to inform defendant's family of the gun's whereabouts).[2] The majority's analysis, however, fails to give proper weight to the primary principles of law established in *Innis*: "the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, *without regard to objective proof of the underlying intent of the police*." *Innis*, 446 US at 301 (emphasis added).[3]

Likewise, the majority engages in a monumental effort to minimize the coercive atmosphere that defendant faced. For example, in attempting to distinguish this case

---

[2] Notably, the record is devoid of any support for the majority's speculation regarding Stiles's subjective intent in making the statements at issue.

[3] Although *Innis* recognized that the officer's intent "may well have a bearing" on the analysis, it also explained that the officer's intent is most relevant "where a police practice *is designed* to elicit an incriminating response from the accused [because] it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Innis*, 446 US at 301 n 7 (emphasis added). Thus, the majority's speculative conclusion that Stiles *did not* intend to elicit an incriminating response is of little relevance because Stiles nevertheless should have known that his statement was reasonably likely to elicit an incriminating response. See *In re EG*, 482 A2d at 1248 n 6 (concluding that the officer's statement amounted to interrogation even though the officer testified that he did not expect a response to his statement).

from *In re EG*, the majority speculates that Stiles made the statements at issue out of "a genuine and legitimate concern about the danger posed by the missing gun," whereas the officer in *In re EG* had no similar motive for his statements. *Ante* at 16 n 8. However, the officer in *In re EG* was in the process of arresting a person who was suspected of using a gun to commit a crime *with a partner*. Because the officer in *In re EG* did not immediately find a gun, it was possible that the defendant's partner had the gun and the officer's personal safety was in immediate danger. Thus, the officer arguably had an even more pressing and objectively verifiable "concern about the danger posed by the missing gun" than did Stiles. Nevertheless, *In re EG* held that the officer's statements amounted to interrogation under *Innis*. Accordingly, I find unpersuasive the majority's attempt to distinguish *In re EG* on this basis.[4]

More importantly, however, the majority's parsing of the factual circumstances to distinguish *In re EG* from this case is irrelevant because the court in that case did not rely on *any* of the circumstances noted by the majority here in support of its conclusion that the officer's statements amounted to the functional equivalent of interrogation. What is relevant is that the court in *In re EG* stated that the situation was "[u]nlike the situation in *Innis*" because "no other person was present" when the officer made the comments. *In re*

---

[4] The majority's conclusion that Stiles made the statements at issue "during a completely civil conversation with defendant," *ante* at 16 n 8, is equally unpersuasive because that conclusion fails to recognize the reality of defendant's circumstances. I believe that it is far more realistic and reasonable to conclude that most people would not perceive a one-on-one "discussion" with a homicide detective in a windowless police interrogation room to be a completely civil conversation.

*EG*, 482 A2d at 1248. *In re EG* concluded on the basis of that fact that the officer's comments were "precisely [the] type of tactic . . . [that] is prohibited by *Miranda*" and, thus, the functional equivalent of interrogation under *Innis*. *Id*.

*In re EG*'s application of *Innis* is correct because, despite the majority's unwillingness to consider it, the primary focus of an *Innis* analysis must be "upon the *perceptions of the suspect*, rather than the intent of the police." *Innis*, 446 US at 301 (emphasis added). Thus, no matter how noble the officer's intent, if the officer should have known that it was reasonably likely that the suspect would perceive the statements as seeking a response that requires the suspect to divulge incriminating information, the officer's statements are the functional equivalent of interrogation.

Similarly, the majority concludes that Stiles's comments were, at most, "subtle compulsion" because the comments were less "evocative" than the officers' comments in *Innis*. In support of this conclusion, the majority relies on the fact that Stiles made no mention of handicapped children or God. Again, this view of Stiles's statements ignores the *context* in which they were made; specifically, that the comments were unquestionably directed to defendant. As previously explained, depending on the context, a statement clearly directed to a specific person is reasonably likely to elicit a response from that person. Thus, while the *content* of Stiles's statement may not have been particularly "evocative," Stiles should have known that, given the *context* in which the statement was made, it was reasonably likely that defendant would perceive the statement as seeking to evoke a response.

14

Additionally, Stiles did not simply express his desire that no one else be harmed by the gun and then leave the room. Rather, Stiles pressed defendant by adding "okay" and, after a pause, further adding "all right." Although it is conceivable that these words did not amount to express questions for the reasons previously discussed, defendant could reasonably have perceived the words, along with the pause between them, as seeking a response on his part. The majority apparently rejects this possibility and instead assumes that Stiles was merely ensuring that defendant heard and understood his comments regarding the danger that the gun posed. See *ante* at 11. The majority fails to consider the next logical step in its analysis, however. Specifically, if Stiles was ensuring that defendant heard his statement, one must ask why Stiles made that effort. The most likely answer is that Stiles hoped that defendant would respond by divulging the gun's location. Thus, even if Stiles's motivation was purely altruistic as the majority speculates, he should have nevertheless known that his statement was reasonably likely to elicit an incriminating response from defendant. Accordingly, the statement satisfies the definition of the functional equivalent of interrogation from *Innis* because a suspect's constitutionally protected rights cannot be cast aside simply because the questioning officer's subjective intent may have been laudable.

The nature of Stiles's comments is also relevant to determining how defendant perceived the comments and whether Stiles should have known that his comments were reasonably likely to elicit an incriminating response from defendant. For example, *Arizona v Mauro*, 481 US 520, 529; 107 S Ct 1931; 95 L Ed 2d 458 (1987), noted that *Miranda* and *Innis* held that subjecting a suspect to "compelling influences" or

15

"psychological ploys" were techniques of persuasion that amount to interrogation when used in a custodial setting. *Mauro* also emphasized that

> [i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards* [*v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981)]: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. [*Id.* at 529-530.]

*Mauro*'s analysis was based on *Innis*, which stated that "*Miranda* also included in its survey of interrogation practices the use of *psychological ploys*, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.'" *Innis*, 446 US at 299, quoting *Miranda*, 384 US at 450 (emphasis added) (alteration in original). Also, the *Mauro* Court explained that *Innis*

> reviewed the police practices that had evoked the *Miranda* Court's concern about the coerciveness of the interrogation environment. The questioned practices included . . . *a variety of psychological ploys* . . . . None of these techniques involves express questioning, and yet the Court found that any of them, coupled with the interrogation environment, was likely to subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination. [*Mauro*, 481 US at 526 (quotation marks and citations omitted; emphasis added).]

Thus, the majority is incorrect that "*Mauro* simply noted that the defendant in that case had *not* been subjected to 'psychological ploys.'" *Ante* at 15 n 7. Rather, *Mauro* held that the defendant had not been interrogated precisely because the defendant was not subjected to psychological ploys. See *Mauro*, 481 US at 529 (stating that the defendant was not subjected to psychological ploys and concluding, "[t]hus, [the defendant's] volunteered statements cannot properly be considered the result of police interrogation").

16

Indeed, other jurisdictions have interpreted *Miranda*, *Innis*, and *Mauro* as holding that psychological ploys may constitute interrogation, depending on the circumstances of the case. See, e.g., *Commonwealth v Larkin*, 429 Mass 426, 431 n 4; 708 NE2d 674 (1999) (noting that the functional equivalent of express questioning has been construed as "including 'psychological ploys' likely to elicit [an incriminating] response"), citing *Mauro*, 481 US at 526.[5]

In this case, Stiles's statements, which were expressly directed to defendant, played to the likelihood that defendant would respond to an expression of concern for the safety of others. Thus, the nature of Stiles's statements had the characteristics of a psychological ploy that exerted a compelling influence on defendant because the comments implied that defendant was the only person who knew where the gun was located and, thus, implied that defendant had a responsibility to make that information known so that others would not be harmed.[6] The only way that defendant could make

---

[5] See, also, *State v Northern*, 262 SW3d 741, 753 (Tenn, 2008) ("[I]n a custodial setting, certain psychological ploys . . . are 'techniques of persuasion, no less than express questioning' which 'amount to interrogation.'"), quoting *Innis*, 446 US at 299, and citing *Miranda*, 384 US at 450; *Edmonds v State*, 955 So 2d 787, 807 (Miss, 2007) (Diaz, P.J., concurring) (concluding that the police conduct at issue was "'precisely the kind of psychological ploy that *Innis*'s definition of interrogation was designed to prohibit'"), quoting *Nelson v Fulcomer*, 911 F2d 928, 935 (CA 3, 1990) (citations omitted); *People v Rivas*, 13 P3d 315, 319 (Colo, 2000) ("Practices identified as the functional equivalents of interrogation generally employ compelling influences or psychological ploys in tandem with police custody to obtain confessions."); and *State v Lockhart*, 298 Conn 537, 590; 4 A3d 1176 (2010) (Palmer, J., concurring) ("[I]nterrogation methods used by the police . . . often include sophisticated psychological ploys and techniques . . . ."), citing Garrett, *The substance of false confessions*, 62 Stan L Rev 1051, 1060 (2010).

[6] The majority argues that my interpretation of this psychological ploy is too attenuated to

that information known, however, was to give an incriminating statement in response to Stiles's statements. Thus, Stiles's statements used what *Miranda* identified as one of the hallmarks of interrogation: "[t]he aura of confidence in [defendant's] guilt [that] undermines [defendant's] will to resist." *Miranda*, 384 US at 455. Indeed, because the comments were expressly directed to defendant, Stiles placed defendant in a situation in which defendant "merely confirm[ed] the preconceived story the police [sought] to have him describe," i.e., that defendant knew the location of the gun because he had used the gun to commit the murder.[7] *Id*. Accordingly, Stiles should have known that his

---

rise to the level of interrogation under *Innis*, see *ante* at 13; however, *all* psychological forms of interrogation rely on a human trait that is common to most people but not necessarily exhibited by *all* people. For example, *Miranda*, 384 US at 450, concluded that police tactics that "minimize the moral seriousness of the offense" or "cast blame on the victim or on society" are psychological ploys that may constitute interrogation practices depending on the circumstances. Surely, not all suspects would respond to such tactics, but the tactics nevertheless may constitute interrogation because they play to traits that are common to many, but not all, people. In my view, because concern for the safety of others is also a common human trait, the same is true of Stiles's comment. And when the compelling influence of Stiles's statement is combined with the custodial setting and other factors discussed throughout this opinion, I believe that defendant was subjected to the functional equivalent of questioning because the totality of the custodial circumstances caused defendant to make an incriminating statement "that would not [have been] given in an unrestrained environment." *Mauro*, 481 US at 530.

[7] This aspect of Stiles's statements illustrates another significant difference between this case and *Innis*. Because the officers in *Innis* were merely conversing amongst themselves regarding their concern about the whereabouts of the gun, the *Innis* defendant was not placed in a situation in which he merely needed to confirm the officers' preconceived belief that he was guilty. Rather, as the *Innis* Court held, the officers' comments did not compel *any* response from the defendant. Conversely, in this case, not only could Stiles's statement have been reasonably perceived by defendant as seeking a response given that the statement was expressly directed to him, the statement could also have exerted a compelling influence on defendant to merely confirm Stiles's preconceived conclusion that defendant had committed the crime.

18

comments were reasonably likely to elicit an incriminating response because it was reasonably likely that defendant would perceive the comments as compelling a response in order to protect others, particularly because Stiles expressly directed his statements to defendant.[8]   Finally, other courts have recognized that a defendant's personal characteristics or relationship with the questioning officer might influence how that defendant perceives a police officer's statements.  For example, in *Stewart*, 668 A2d at 866, the defendant invoked his right to remain silent and, several hours later, a detective who had attended the same church as the defendant for many years took the defendant to a jail cell.  The detective told the defendant not to feel bad about the situation and that the other members of the church would not judge him and would be a support group for him. Several hours after the detective made the religion-themed statements to the defendant, the detective again visited the defendant and the defendant confessed.  *Stewart* held that

---

[8] Contrary to the majority's interpretation of my opinion, this portion of my analysis does not conclude that defendant exhibited an "unusual" or "peculiar" susceptibility to a certain form of persuasion.   As previously explained, like many psychological interrogation techniques that rely on a human trait that is common to most people, Stiles's comments appealed to a common characteristic: concern for others.  Rather than consider this possibility as part of a complete consideration of totality of the circumstances, the majority prefers to employ broad stereotypes, such as its belief that all suspects charged with homicide are cold-blooded killers.  The majority's approach is erroneous because, if this were true, Stiles would not have bothered to make the statement at issue.  Indeed, if Stiles had no reason to "fathom[]" that defendant harbored any concern for the safety of others given that "defendant had just been arrested for shooting another man to death for drugs," *ante* at 13, why would Stiles bother to make the statement?  The majority fails to consider that, as defendant's incriminating statement suggests, he made an extremely poor decision to perpetrate a robbery, but the shooting was not the intended result.  A poor decision that led to a deadly, but unintended, result does not automatically sap defendant of his humanity.  Thus, the majority's analysis fails to consider the important factual intricacies of this case.

the religion-themed statements amounted to unlawful interrogation and rejected the prosecution's argument that the detective's statements were spontaneous, casual, and purely of a personal nature. *Id.* The *Stewart* court explained that the detective was "an experienced homicide detective . . . capable of exploiting an opportunity." *Id.* Accordingly, "[n]o conversation concerning a criminal investigation between such a detective and a suspect can be said to be 'purely personal.'" *Id.* Rather, the *Stewart* court determined that the "conversation can only be characterized as the first preparatory step of someone experienced in conducting interrogations." *Id.* Similarly, *In re EG*, 482 A2d at 1248 n 6, noted the defendant's youthfulness as one of the circumstances supporting the conclusion that the officer should have known that his statements were reasonably likely to elicit a response, and *United States v Rivera-Ruiz*, unpublished opinion of the United States District Court for the District of Minnesota, issued May 14, 2002 (Docket No. CR 02-57 ADMRLE), held that "[t]he [d]efendant's foreign status and likely unfamiliarity with U.S. constitutional rights" were relevant to determining how the defendant perceived the officer's statements.

In this case, defendant was 17 years old when he was arrested, and he had no prior criminal convictions. Although any person in police custody might view the questioning officer as an authority figure and thus feel compelled to respond to the officer's statements, defendant's youth and inexperience with the criminal justice system are relevant factors in determining how defendant perceived Stiles's comments. Because these factors, combined with the fact that Stiles's comments implied that defendant had a responsibility to protect others, increased the likelihood that defendant would feel

20

compelled to respect and comply with Stiles as an authority figure, I would conclude that Stiles should have known that his comments were reasonably likely to elicit an incriminating response.

In summary, despite the similarities between the content of Stiles's comments in this case and the *Innis* officers' statements, I believe that several important factors distinguish this case from *Innis*. First, Stiles expressly directed his statements to defendant; thus, it was more likely that defendant would perceive the statements as seeking a response. Likewise, Stiles should have known that by expressly directing the comments to defendant, it was reasonably likely that defendant would respond. Second, Stiles's statements had the characteristics of a "psychological ploy" that exerted a "compelling influence" on defendant because the statements played to the likelihood that defendant would feel compelled to protect others. Third, several of defendant's individual personal characteristics increased the likelihood that he would perceive Stiles's comments as requiring a response.

Accordingly, from the totality of the circumstances, I would conclude that it was not "unforeseeable" that Stiles's comments would result in an incriminating response from defendant. *Innis*, 446 US at 302. Rather, defendant could have reasonably perceived that Stiles expected a response, and Stiles should have known that his comments were "reasonably likely to elicit an incriminating response from [defendant]." *Id*. at 301. As a result, I believe that defendant was improperly subjected to the functional equivalent of interrogation after invoking his Fifth Amendment right against compelled self-incrimination. Accordingly, I would reverse the judgment of the Court of

21

Appeals and reinstate the trial court's order suppressing defendant's incriminating statements.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                                No. 144387

KADEEM DENNIS WHITE,

      Defendant-Appellant.

_____

MARY BETH KELLY, J. (*dissenting*).

I respectfully dissent. I believe that Detective Brett Stiles engaged in the "functional equivalent" of express questioning by exploiting defendant's youth, a characteristic that made him particularly susceptible to Stiles's compulsive techniques. Because this constituted "interrogation" and defendant had invoked his right to remain silent, I would reverse the judgment of the Court of Appeals and suppress defendant's statement.

It is a violation of the principles announced in *Miranda v Arizona* to interrogate a suspect after he or she invokes the right to remain silent.[1] An "interrogation" occurs when an individual in custody is subjected to either "express questioning" or its "functional equivalent."[2] As either express questioning or its functional equivalent, "interrogation" requires "a measure of compulsion above and beyond that inherent in

---

[1] *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

custody itself," and it generally must consist of more than mere "subtle compulsion."[3] *Rhode Island v Innis* explained that the "functional equivalent" prong of interrogation involves "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should* know are reasonably likely to elicit an incriminating response from the suspect."[4]  In determining whether police words or actions amount to the functional equivalent of express questioning, we focus on the perceptions of the suspect, rather than the intent of the police.[5]  However, any knowledge that the police may have concerning a defendant's unusual susceptibility to a particular form of persuasion may be an important factor in determining whether the police should have known their conduct would elicit an incriminating response.[6]

In circumstances such as those presented here, a defendant's youth might make him or her particularly vulnerable to police interrogation tactics and constitute the type of unusual susceptibility contemplated in *Innis*.  The United States Supreme Court has spoken extensively about the unique characteristics of minors, recognizing that they are generally wanting in maturity, more susceptible to outside influences, and "'often lack[ing] the experience, perspective, and judgment to recognize and avoid choices that

---

[3] *Id.* at 300, 303 (quotation marks and citation omitted).

[4] *Id.* at 301 (emphasis added).

[5] *Id.*  The intent of the police is relevant only insofar as it bears "on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."  *Id.* at 301 n 7.

[6] *Id.* at 302 n 8.

2

could be detrimental to them . . . .'"[7] These characteristics describe minors generally as a class and are readily apparent, indeed "self-evident," to all adult observers.[8] Moreover, these commonsense observations about the nature of adolescents have been corroborated by developments in psychology and brain science.[9] Given the unique characteristics of minors, they have long been afforded a special regard in the law, subjected to unique standards in areas such as contract enforcement, the ability to marry, and even the ability to vote and to serve on juries.[10]

In the custodial-interrogation context, the unique attributes of minors require courts to exercise "special care" in their scrutiny of the record.[11] Courts should be mindful that, as compared to an adult, a juvenile suspect faces a more acute risk of succumbing to the inherent pressures of custodial interrogation such that the juvenile

---

[7] *JDB v North Carolina*, 564 US___, ___; 131 S Ct 2394, 2403; 180 L Ed 2d 310 (2011), quoting *Bellotti v Baird*, 443 US 622, 635; 99 S Ct 3035; 61 L Ed 2d 797 (1979); see also *Eddings v Oklahoma*, 455 US 104, 115; 102 S Ct 869; 71 L Ed 2d 1 (1982) (recognizing youth as a "time and condition of life when a person may be most susceptible to influence and to psychological damage").

[8] *JDB*, 564 US at ___; 131 S Ct at 2403; see also *Roper v Simmons*, 543 US 551, 569; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

[9] *Graham v Florida*, 560 US ___, ___; 130 S Ct 2011, 2026; 176 L Ed 2d 825 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.").

[10] *JDB*, 564 US at ___; 131 S Ct at 2403-2404; *Roper*, 543 US at 569.

[11] *Haley v Ohio*, 332 US 596, 599; 68 S Ct 302; 92 L Ed 224 (1948); see also *Gallegos v Colorado*, 370 US 49, 54; 82 S Ct 1209; 8 L Ed 2d 325 (1962) (recognizing that a teenager, "no matter how sophisticated," may not be "compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions").

3

might "'speak where he would not otherwise do so freely.'"[12] A suspect's age may shape the suspect's reasonable perception of whether he or she is in police "custody"[13] and affect the suspect's response to police questioning and conduct.[14]

Because juveniles often lack the wherewithal to resist police pressures, they thus become uniquely susceptible to police interrogative efforts, including subtly compulsive techniques, and should reasonably be expected to respond to those efforts. Police officers interacting with a minor suspect must be charged with knowledge of the particular vulnerabilities of minors because youthful characteristics are "self-evident to anyone who was a child once himself, including any police officer or judge."[15] To allow the police to exploit the susceptibilities of minors who have invoked the right to remain silent, i.e., to allow the interrogation of a suspect after he or she invokes his right to remain silent, would run afoul of both *Innis* and *Miranda*.[16] As such, when a custodial interrogation involved a minor suspect who asserted his or her right to remain silent, courts considering whether the minor was subjected to the functional equivalent of interrogation must be

---

[12] *JDB*, 564 US at ___; 131 S Ct at 2401, quoting *Miranda*, 384 US at 467.

[13] See *JDB*, 564 US at ___; 131 S Ct at 2403 ("[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.").

[14] *Haley*, 332 US at 599 (concluding police conduct "which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens").

[15] *JDB*, 564 US at ___; 131 S Ct at 2403.

[16] *Innis*, 446 US at 300-302; *Miranda*, 384 US at 473-474 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.").

4

especially mindful of the unique susceptibility that results from youth and the role that the defendant's age played in the defendant's perception of the circumstances.

In this case, Stiles should have recognized that defendant's age made him especially susceptible to subtle compulsive efforts and that such conduct would likely elicit an incriminating response. Given defendant's age of 17 years[17] and lack of any criminal record, it would have been readily apparent that defendant lacked the experience and perspective to make decisions in his best interests or to avoid succumbing to police pressure. Rather than "scrupulously honor[]" defendant's unequivocal invocation of his right to remain silent,[18] Stiles subjected the minor suspect to continued police pressure, which included references to violence, attempts to earn defendant's trust, and appeals to defendant's conscience:

> [*Stiles*]: Okay. [T]his is what they call the acknowledgment and waiver paragraph [and] I'm going to read this to you. If you wish to talk to me, I'm going to need you to sign and date [the] form. Even though you sign and date the form, you still have your rights to stop at any time you wish. Do you understand that?
>
> [*Defendant*]: No. No thank you sir. I'm not going to sign it.
>
> [*Stiles*]: Okay. Okay. Sounds good.

---

[17] The majority emphasizes that *JDB*, 564 US at ___; 131 S Ct at 2399, involved a 13-year-old defendant, suggesting that the unique attributes of adolescents recognized by the United States Supreme Court do not apply to 17-year-old minors. Contrary to the majority's suggestion, the Supreme Court also discussed many of the distinguishing characteristics of adolescents in *Roper*, 543 US at 556, a case involving a defendant who committed murder when he was 17-years-old. Given the continued vulnerability of older teenagers, it can reasonably be supposed that the protections afforded minors as a result of their unique characteristics apply to 17-year-olds such as defendant.

[18] *Miranda*, 384 US at 479.

[*Defendant*]:  I don't even want to speak.

[*Stiles*]:  I understand.  I understand Kadeem.

Okay then.  The only thing I can tell you Kadeem, is good luck man.

Okay.  Don't take this personal.  It's not personal between me and you, I think I may have had one contact with you on the street.  Okay.  I've got to do my job.  And I understand you've got to [do] what you've got to do to protect your best interests.  Okay.

The only thing that I can tell you is this, and I'm not asking you questions, I'm just telling you.  I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay?

All right?

[*Defendant*]:  I didn't even mean for it to happen like that.  It was a complete accident.

[*Stiles*]:  I understand.  I understand.

But like I said, you, uhh, you get your attorney, man.

Hey, look dude, I don't think you're a monster, all right?  I don't think that.  You could have came down to me and turned yourself in and there ain't no damn way I'd beat you up.

[*Defendant*]:  Yeah.

[*Stiles*]:  Okay, man?

You all set, you straight with me?

Who knows you're here?  Who knows of your family?  Because I know a lot of your family in town now.

[*Defendant*]:  ([U]nintelligible reply).

I know that I didn't mean to do it.  I guarantee that, I know I didn't mean to do it.[19]

---

[19] The interrogation was recorded on a DVD.  Defendant included a transcript of the interrogation in his motion to suppress his statements.  Given that the prosecution

6

Considering the entirety of the exchange, several comments appear designed to foster an atmosphere in which defendant would be reasonably likely to make an incriminating response.[20] Particularly, Stiles initially attempted to put defendant at ease, to portray himself as a neutral party rather than an adversary in an interrogation. He wished defendant "good luck" and told him: "Don't take this personal. It's not personal between me and you . . . ." He also assured defendant that "I understand you've got to [do] what you've got to do to protect your best interests." Having presented himself as reasonable and understanding, Stiles invited defendant to make an incriminating response, telling defendant, "I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay?" Examining the remarks from the viewpoint of a teenager facing an authority figure in an interrogation room, I believe it reasonably foreseeable that the type of subtle coercive techniques Stiles used would prompt defendant to provide an incriminating response. As would be expected, defendant incriminated himself by stating, "I didn't even mean for it to happen like that. It was a complete accident."

---

"[a]greed to the transcript" in its response to the motion, I quote defendant's transcription here, including his use of punctuation.

[20] In analyzing the exchange, the majority focuses exclusively on the significance of the *Innis*-like reference to the gun's location and Stiles's related expression of concern for the safety of others, ignoring the larger context in which this statement occurred. Believing that the only relevant portion of the exchange involves Stiles's reference to the gun's location, the majority disputes whether a 17-year-old is more susceptible to an appeal to his or her conscience. But the colloquy must be regarded in its entirety. In its entirety, the appeal to defendant's conscience was coupled with references to violence and attempts to earn defendant's trust through expressions of understanding and references to defendant's family. It was to that *entire* exchange that the youthful defendant succumbed, not merely the isolated appeal to his conscience through the single question with regard to the location of the gun.

7

Even after defendant demonstrated his youthful vulnerability to subtle compulsion, Stiles continued the interview, again presenting himself as a reasonable individual in whom defendant could confide, telling defendant, "I understand.  I understand," and assuring defendant that he did not view him as "a monster."  The detective then interjected a reference to violence into the conversation, telling defendant: "Hey, look dude, I don't think you're a monster, all right?  I don't think that.  You could have came down to me and turned yourself in and there ain't no damn way I'd beat you up."  Such references to violence in the isolation of an interrogation room would reasonably increase the anxiety experienced by a youthful suspect.  At the same time, Stiles also sought to establish ties with defendant, professing a familiarity with defendant's family members in town and asking defendant:  "Who knows you're here?  Who knows of your family?  Because I know a lot of your family in town now."  Not surprisingly, the overwhelmed adolescent again responded with an incriminating statement, telling Stiles: "I know that I didn't mean to do it.  I guarantee that, I know I didn't mean to do it."

When examined in their entirety, Stiles's remarks included a number of police tactics to which a vulnerable youth would be readily susceptible. The colloquy involved efforts to establish a rapport with defendant, including references to his family, while in the same conversation, Stiles also managed to heighten the inherent stress of a custodial situation by referring to violence.  It was in this context that Stiles made the most obvious overture to elicit an incriminating response from defendant: the remark about the gun's location.  While Stiles's remarks might not be reasonably likely to elicit an incriminating response from an adult, all these comments considered together, and in context, made it reasonably likely that the minor defendant in this case would respond in an incriminating

8

manner. Consequently, because defendant's youthful susceptibility to compulsion would have been readily apparent and Stiles should have known that his remarks were reasonably likely to elicit an incriminating response, I would hold that defendant was subjected to interrogation after he invoked his right to remain silent and I would suppress his statement.

Mary Beth Kelly

McCORMACK, J., took no part in the decision of this case.